**The STATE of Ohio, Appellee,**

**v.**

**GEST, Appellant.**

[Cite as *State v. Gest* (1995), 108 Ohio App.3d 248.]

Court of Appeals of Ohio,
Eight District, Cuyahoga County.

Nos. 68369, 68370.

Decided Dec. 29, 1995.

*Stephanie Tubbs Jones,* Cuyahoga County Prosecuting Attorney, and *Anthony Kellon,* Assistant Prosecuting Attorney, for appellee.

*Short, Shepherd & Stanton* and *Mark A. Stanton,* for appellant.

JAMES D. SWEENEY, Judge.

Defendant-appellant Demetrius A. Gest, born July 20, 1975, appeals from his jury trial convictions for the following offenses: (1) in C.P. case No. CR–312957 (appeal No. 68369), one count of aggravated robbery (R.C. 2911.01) of Daniel Campbell/Pizza Hut with a firearm specification and one count of grant theft, motor vehicle (R.C. 2913.02), which vehicle, a red/burgundy 1987 Ford Taurus, was operated by Daniel Campbell; and, (2) in C.P. case No. CR–313841 (appeal No. 68370), one count of receiving stolen property (the red Taurus owned by Mrs. Campbell and operated by her son, Daniel Campbell) (R.C. 2913.51).[1] The common feature to these offenses is the act of carjacking. For the reasons adduced below, we affirm in part and reverse and remand in part.

A review of the record on appeal indicates that eleven witnesses testified on behalf of the state. The first prosecution witness was Daniel Campbell, who testified in pertinent part as follows: (1) on June 19, 1994, he was working as a Pizza Hut deliveryman; (2) while on a delivery run at approximately 8:30 p.m., a car followed him from the intersection of East 222nd Street and Tungsten Road to his delivery destination on East 219th Street; (3) as he parked on the street at the address of the pizza order, he noticed the other car pull into a nearby driveway and turn around; (4) as he reentered his own car, the other car, containing three to four figures, pulled up alongside and stopped; (5) Gest got out of the other car, approached the witness, and asked to buy a pizza while another male came up from behind; (6) the witness, whose attention was riveted on Gest, responded that he could not buy a pizza; (7) Gest then told the witness to "just give him a pizza"; (8) the witness responded that he could not give him a pizza; (9) at that point, Gest, wearing a grey long-sleeved buttoned shirt and possibly a dark bandana covering the back of his head, briefly displayed a dark-colored semi-automatic pistol from beneath the shirt, and ordered the witness to get out of the red Taurus; (10) upon the order of one of the two people from the other car, the witness lay face down in the street; (11) Gest drove the red Taurus away, which car contained the wallet of the victim, while the other man drove the other car ahead of it; (12) the red Taurus was owned by the witness's mother, who had allowed the witness to use it that night; (13) he identified Gest in court as the man who stole the car; (14) he observed Gest for approximately thirty to forty-five seconds at the time of the offense; (15) at the time of the offense, it was beginning to turn dusk and had not yet turned dark outside; (16) after the pair had left the area, the witness telephoned the Euclid Police from the home where

---

1. The two criminal cases were consolidated for trial and appeal purposes. In case No. CR–313841, Gest was acquitted of one count of receiving stolen property, to wit, the black Ford Crown Victoria owned by Mr. Farmer.

he had just delivered the pizza, describing the cars and the perpetrators; (17) he described Gest to the police dispatcher as "about five-ten, stocky, probably about 195 pounds, kind of big. * * * A young black gentleman about late teens or possibly early twenties"; (18) he described the offenders' car as a silver, or grey, or very light blue Chrysler LeBaron-type car, and the accomplice as approximately sixteen years old, about five feet, six inches tall and weighing one hundred fifty pounds; (19) he gave a statement to the police the day after the offense and again about two weeks later when he provided a detailed description of Gest's face from which a computer generated composite sketch was rendered; (20) in early July 1994, he was shown a photographic array consisting of four color photographs taped to a common page, and without prompting by the police, picked out photograph number two, Gest's photograph, as the suspect who robbed him; (21) the witness is six feet, one inch tall and weighs one hundred ninety-five pounds and the man who robbed him was shorter and appeared heavier than the witness.

The second witness for the prosecution was Euclid Police Detective James Baird, who stated in pertinent part as follows: (1) he has been a police officer for fourteen and one-half years and one of his present duties is to perform the computer composite sketches in the department; (2) he prepared the composite sketch of the suspect based on information provided by the previous witness; (3) the state of accuracy between the actual person and the composite sketch is not one hundred percent; (4) the victim approximately described the suspect on June 20, 1994, as a black male, eighteen years old, five feet, nine inches tall, one hundred seventy-five pounds, wearing a long-sleeved shirt with baggy shorts.

The third witness for the prosecution was Euclid Police Patrolman Timothy Verh, who stated the following: (1) he responded to the scene of the offense at approximately 9:30 p.m. following the telephone call of the victim; (2) at that time the victim gave a description of two suspects as previously detailed in the victim's testimony; (3) the victim was very shaken by the ordeal, but was adamant that he could identify suspect number one (Gest); (4) the victim stated that his wallet, which was inside the car, was also taken by the suspects.

The fourth witness for the prosecution was Euclid Police Detective Kenneth Kaselonis, who stated the following: (1) he has been a police officer for twenty-nine years; (2) several days subsequent to the date of the offense involving Campbell, he was notified that the red Taurus had been recovered by the Cleveland Police Department; (3) four suspects, including two juveniles (Jovan Norton and Tremal Wilson) and two adults (Gest and Courtney Pettway), had been arrested at the scene of the recovery; (4) photographs of the four suspects comprised the photographic array shown to Campbell; (5) Campbell almost immediately picked out Gest's photograph.

The fifth witness for the prosecution was Cleveland Police Detective Edward Prinz, who stated the following: (1) he is employed in the scientific investigation unit's ("SIU") latent fingerprint section; (2) he has been a police officer for twenty-eight and one-half years, the last nineteen years in SIU; (3) a latent left palm print identified as Gest's was found on the red Taurus; (4) two latent fingerprints, the right middle and ring fingers, identified as Gest's were found on the Ford Crown Victoria; (5) suspect Norton's fingerprints were located at the top of the exterior passenger door frame on the Ford Crown Victoria; (6) suspect Wilson's fingerprints were located on the Ford Crown Victoria's trunk lid and above the door to the fuel tank; (7) identifying information on Gest taken at the time of his arrest and sent with the fingerprints to the lab indicated that Gest was a black male, six feet, one inch tall, weighing one hundred ninety-five pounds.

The sixth witness for the prosecution was Cleveland Police Patrolman Christopher Harper, who stated the following: (1) he has been a police officer for five years; (2) while on routine patrol with his partner, Officer Kelly, in the afternoon of June 22, 1994, he observed a group of males in a Burger King parking lot at West 32nd Street and Clark Avenue congregating near a red Taurus and a black Crown Victoria, and one male was seated inside the Taurus; (3) the license plate numbers, which were processed through the police computer, indicated that these two vehicles had been reported as stolen; (4) as the officers pulled around toward the restaurant lot, the males near the cars, after noticing the police attention, were observed walking quickly into the restaurant; (5) one male, identified in the courtroom as Gest by the witness, remained inside the red Taurus; (6) the witness apprehended several males inside the restaurant while the partner apprehended Gest; (7) when the witness arrested Gest, he described Gest as five feet, eleven inches tall, weighing one hundred sixty pounds.

The seventh witness for the prosecution was Cleveland police patrolman David Kelly who generally corroborated the testimony of Officer Harper, adding the following: (1) the ignition keys were found inside the red Taurus; (2) four suspects were arrested at the Burger King that afternoon; (3) Gest was seated in the Taurus's driver's seat; (4) the witness filled out the arrest report.

The eighth witness for the prosecution was Cleveland Police Detective Michael Smith, who stated the following: (1) he has been a police officer for seventeen years; (2) he was assigned to investigate an aggravated robbery at 6001 Broadway Avenue involving the Ford Crown Victoria of James Farmer; (3) he also became involved in Gest's case involving the receipt of stolen property represented by the red Taurus; (4) as a result of a conversation with Gest's mother, the witness ran a LEADS computer check for all vehicles listed to Gest's mother; (5) this computer search revealed that the mother owned a 1990 Hyundai Excel bearing, as close as the witness could recall, the license plate

number AGG 482; (6) Farmer indicated to the witness that in the Crown Victoria carjacking, a small red car, from which a group of males brandishing weapons emerged, was used to block his path.

The ninth witness for the prosecution was Cleveland Police Lieutenant Wayne Kapantas, who stated the following: (1) he is in charge of the crime scene unit; (2) Detective Franke, of the crime scene unit, lifted the latent prints from the vehicles; (3) the prints in evidence are processed and kept in the normal course of business at the unit.

The tenth witness for the prosecution was Robert Farmer, who stated the following: (1) at approximately 11:00 p.m. on June 21, 1994, he was the victim of a carjacking while driving his black Crown Victoria along Broadway Avenue in Cleveland; (2) a red car pulled up alongside his car, two black males exited the other car, both armed with guns; (3) he was ordered out of his car; (4) the two robbers then drove off in his car, followed by the small red car; (5) one of the robbers was approximately five feet, seven inches tall and weighed about one hundred forty pounds; (6) the suspect who drove the stolen car away was approximately six feet tall, with close cropped hair, wearing dark pants and shirt, and pointed a gun at him as he ordered him out of the car; (7) the license plate number displayed by the red car looked like ACG 428 or 482; (8) he reported the robbery to the police, who recovered his stolen car about five days later; (9) he did not identify the perpetrators from a lineup at the police station because he was still shaken up and did not wish to misidentify the suspects; (10) he was not one hundred percent sure that anyone in the courtroom was the man who robbed him.

The eleventh witness for the prosecution was Mary Gest, the mother of the defendant-appellant, who stated the following: (1) she telephoned the police because she was concerned about her son whom she had not seen for a period of time; (2) she discussed her red Hyundai Excel which displays, she thinks, the license plate number AGG 481; (3) she lives on East 115th Street near St. Clair Avenue in Cleveland; (4) her employment hours at her two jobs run from 7:30 a.m. to 5:00 p.m. Tuesday through Saturday, and 5:30 p.m. to 9:30 p.m. on various days of the half-time week; (5) on June 19, 1994, a Sunday, she and the defendant went to church from approximately 11:00 a.m. to 1:15 p.m.; (6) the two returned home, at which time she went out alone until about 4:30 p.m., leaving the defendant at home alone; (7) the defendant spent the evening following 4:00 p.m. at home with her; (8) during that evening, defendant's friend, Rashon, telephoned around 8:00 p.m.; (9) on June 21, 1994, a Tuesday, she worked that day at both of her jobs, leaving the second job in Mayfield Heights' Goldengate Shopping Center around 9:45 p.m., driving herself home, arriving at home around 10:10 p.m.; (10) no one besides herself used her car that day; (11) the defendant

dropped out of high school to work at various jobs; (12) the defendant has been arrested twice in 1994, once being this case.

At this point the prosecution rested its case. The defense moved for acquittal pursuant to Crim.R. 29. This motion was denied.

The first witness offered by the defense was the defendant, who stated the following: (1) he is nineteen years old and lives with his mother on East 115th Street; (2) he tries to attend church services at Mt. Sinai Baptist Church on a regular basis, but does miss some services due to work; (3) he has been involved in the Big Brother program since he was sixteen years old; (4) besides the arrests herein, he was arrested on an unrelated charge of aggravated robbery (carjacking) in July 1994 subsequent to the offenses at issue in this trial, which unrelated charge in Cuyahoga C.P. case No. 313731 is still pending; (5) he corroborated his mother's testimony relative to the date of June 19, 1994, except that his mother did not leave the home that afternoon; (6) he answered a few telephone calls that evening while he stayed at home the entire night; (7) his friend, Lemuel, visited him at home that night (June 19) around 10:00 p.m. for a short period of time, and he spoke with a female friend, Charmaine Davieson, on the telephone until almost 1:00 a.m.; (8) on June 21, 1994, he and Jovan Norton went to Tower City downtown at approximately 1:00 p.m. where they walked around for a while; (9) while at Tower City, he spoke with a friend, Danel, who asked the pair to do a favor and pick up Danel's girlfriend at her workplace (the Burger King where he was arrested later that day) in place of Danel, because Danel had to work overtime at Tower City and could not make his appointment; (10) Danel gave the pair bus money for themselves and Danel's girlfriend; (11) he and Norton went to the Burger King as requested, arriving there at approximately 7:30 to 8:00 p.m.; (12) he immediately went inside and told the girlfriend that he was there to escort her and, that done, he went outside to the parking lot to talk with some friends he knew from his high school; (13) these friends were near some cars, which he and Norton leaned against as they spoke with the group; (14) he, Norton, and a Hispanic male were arrested inside the restaurant; (15) Tremal and Courtney were arrested outside in the parking lot; (16) he never operated the red Taurus or the black Crown Victoria, nor did he have any knowledge that these cars were stolen; (17) he is not a member of a gang; (18) Campbell was robbed of $46 and the witness had $41 at the time of his arrest at the Burger King; (19) Tremal Wilson lives in the vicinity of East 222nd Street and Euclid Avenue, not far from where Campbell was carjacked; (20) every case he has been arrested for in 1994 involve stolen cars; (21) he could not recall what he ate the day of his arrest at the restaurant, except that he purchased and ate a slice of pizza downtown before going to the restaurant.

The second witness for the defense was Robert First, who stated the following: (1) he is an attorney, practicing since 1980; (2) he has known the Gest family for approximately ten years with his wife working with Gest's mother and the families interacting socially on a number of occasions; (3) his opinion of Gest's truth and veracity is very favorable.

The third witness for the defense was Minister C.J. Matthews, who stated the following: (1) he is the pastor of Mt. Sinai Baptist Church and has come to know Gest through his duties as pastor and junior pastor over a fourteen-year period; (2) Gest has fairly regular attendance at services, missing some due to conflicting work schedules, and serves on the young people's usher board; (3) his opinion of Gest is that Gest is a joy to be around, is honest and forthright, and a positive influence within the ministry.

The fourth witness for the defense was Lemuel Rashon Jackson, who stated the following: (1) he lives several houses down from the Gest home and has known the Gest family for approximately twelve years; (2) on Sunday, June 19, 1994, he telephoned the Gest home at approximately 8:30 p.m., spoke with Gest telling him that the witness would drop by around 10:30 p.m. to pick up a videotape; (3) he picked up the tape between 10:00 and 11:00 p.m., observed Gest in Gest's bedroom, and went home after staying approximately ten minutes; (4) at the time he telephoned Gest, Gest told him that he was charged with something he did not do; (5) the witness never gave this information to the police.

The fifth witness for the defense was Charmaine Davieson, who stated the following: (1) Gest telephoned her on June 19, 1994, at approximately 10:00 p.m., and spoke with her for two hours, she believes over the course of one continuous telephone call; (2) Gest came over to her house on July 4, 1994, and she planned to testify as an alibi witness on behalf of Gest for a charge that occurred on July 4, 1994; (3) she did not inform the police about the telephone call of June 19, 1994.

The sixth witness for the defense was Dosha Jackson, who stated the following: (1) Gest and her brother are good friends; (2) she was working at the Burger King on the date of the arrest, expecting to be picked up by her boyfriend Danel McAllen when her shift ended at 8:00 p.m.; (3) instead of Danel, Gest arrived, accompanied by Jovan, to give her bus fare home, explaining that Danel had to work overtime and that he and Jovan would escort her home; (4) almost immediately after speaking with Gest, with Gest and Jovan about to order some food at the counter, the police arrived and arrested them inside the restaurant; (5) a black officer, accompanied by several other officers who arrived in the company of the black officer, arrested and handcuffed them; (6) she does not know what time Gest and Jovan came into the restaurant.

At this point the defense rested and renewed its motion for acquittal. This renewed motion was denied. Following closing arguments and instructions to the jury, the jury returned its verdict as previously outlined in the first paragraph of this opinion. This timely appeal presents five assignments of error.

## I

"Appellant was denied his due process right to a fair trial and impartial trial because of prosecutorial misconduct and such conduct constitutes reversible error."

Appellant argues in this assignment that numerous instances of prosecutor misconduct occurred during cross-examination of defense witnesses and during closing argument, thereby denying him a fair trial. In evaluating claims of prosecutorial misconduct, "we must remember that 'the touchstone of analysis " * * * is the fairness of the trial, not the culpability of the prosecutor." * * * The Constitution does not guarantee an "error free, perfect trial." ' " *State v. Hall* (Aug. 3, 1994), Montgomery App. No. 13805, 1994 WL 409639, unreported, quoting *State v. Landrum* (1990), 53 Ohio St.3d 107, 112, 559 N.E.2d 710, 718.

Additionally, the following must be kept in mind by a reviewing court:

"The Supreme Court set forth the standard in evaluating a claim of prosecutorial misconduct in *State v. Keenan* (1993), 66 Ohio St.3d 402, 613 N.E.2d 203, as follows:

" ' * * * The prosecutor carries into court the prestige of "the representative * * * of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest * * * is not that it shall win a case, but that justice shall be done. * * * Consequently, improper suggestions, insinuations and, especially, assertions of personal knowledge are apt to carry much weight against the accused when they should properly carry none." *Berger v. United States* (1935), 295 U.S. 78, 88, 79 L.Ed. 1314, 55 S.Ct. 629[, 633] * * *.' *Id.* at 406 [613 N.E.2d at 207].

"At the same time, this court must remember that the conduct of a prosecuting attorney during the trial cannot be grounds for error unless the conduct deprives the defendant of a fair trial. See *State v. Apanovitch* (1987), 33 Ohio St.3d 19, 24, 514 N.E.2d 394 [400]. In *State v. Gillard* (1988), 40 Ohio St.3d 226, 533 N.E.2d 272, the Ohio Supreme Court found that a cross-examiner may ask a question if the examiner has a good-faith belief that a factual predicate for the question exists." *State v. Pond* (Feb. 16, 1995), Franklin App. No. 94APA07–1007, unreported, 1995 WL 68076; see, also, *State v. Maurer* (1984), 15 Ohio St.3d 239, 15 OBR 379, 473 N.E.2d 768.

■ The appellant argues that misconduct occurred during the cross-examination of the defendant. The first such instance regards the questioning of the defendant as to whether he had been arrested for offenses other than those for which he is on trial in the present case. The foundation for this line of questioning was laid during the direct examination of the defendant, wherein he denied being arrested for anything other than the offenses herein. Accordingly, the prosecutor could inquire further as to other arrests so as to impeach the defendant's credibility.

■ The second instance of alleged misconduct during the cross-examination of the defendant regards questioning the defendant about the identity of other persons who were with him at the restaurant and were also arrested. This line of questioning was also a proper attempt to test the recollection and credibility of the defendant since the defendant testified on direct examination as to who was at the restaurant and who was arrested.

■ The third and fourth instances of alleged misconduct during the cross-examination of the defendant concern the prosecutor's questioning relative to whether the defendant was aware that Tremal Wilson and Jovan Norton had made statements to the police. Defendant answered the question concerning Wilson, stating that he was not aware that Wilson had made a statement. Defendant answered the question concerning Norton stating, "I know he talked to a detective." Immediately following these questions, the trial court sustained repeated objections by defense counsel, ordered the matter stricken and instructed the jury to disregard the questions. While the questions were improper, the court's prompt action negated any prejudice to the defendant, which must be termed as slight as the information provided by the defendant's answers was innocuous.

■ The fifth instance of alleged misconduct concerns questioning the defendant on cross-examination as to whether he was a member of a gang. The defendant denied being a gang member and the defense failed to raise an objection. Based on the testimony presented during the prosecution case that the suspect may have been wearing a dark bandana, it was proper to question the defendant as to whether that article of headwear signified gang membership.

■ The sixth instance of alleged misconduct concerns the prosecutor questioning the defendant on cross-examination and stating that Campbell testified that $46 was taken from him. Defendant, without an objection from defense counsel, answered, "That's what he [Campbell] said." Defendant argues, correctly, that Campbell never testified to the amount of money stolen during the carjacking. Absent an objection, the matter was waived for appellate purposes unless plain error can be demonstrated. Considering the testimony and evidence

presented, particularly where the defendant explained that he had a sum of money ($41) at the time of his arrest because he was employed and had been recently paid, a reasonable explanation the credibility of which should be judged by the fact finder, the matter does not rise to the level of plain error.

The seventh instance of alleged misconduct occurred during the cross-examination of defendant where the prosecutor stated, "You can recall everything your defense attorney asked you. But you have problems recalling questions—." An objection was immediately sustained to this observation and the matter was ordered stricken. This prompt action by the trial court lessened any prejudice to the point that a fair trial cannot be said to have been negated.

The eighth instance of alleged misconduct again touches on questions relating to the defendant's other arrest in February 1994. As previously outlined, this was a proper line of questioning incurring no misconduct by the prosecutor.

The ninth instance of alleged misconduct concerns the prosecutor questioning the defendant about the February 1994 arrest for carjacking and the modus operandi of defendant to steal cars at gunpoint. The defendant denied this was his modus operandi. In addition, there was no objection raised by the defense to this question. Apart from the waiver for appellate purposes, the question was proper considering his arrest earlier in 1994 also involved carjacking.

The tenth instance of alleged misconduct involves the cross-examination of Davieson, wherein the prosecutor asked her whether she was aware that Gest had been arrested for an offense other than that for which he was on trial. There was no answer to this question by the witness. There was an immediate objection by the defense, which objection was sustained. Any prejudice as a result of this question, which is considered slight by virtue of the testimony of Gest relative to the other arrest in February 1994, was minimized by the court's action and did not prevent a fair trial overall.

The eleventh instance of alleged misconduct also occurred during the cross-examination of Davieson, where the following colloquy took place between the prosecutor and the witness:

"Q. Ma'am, isn't it a fact that you planned to testify as an alibi witness for this defendant in another case—

"MR. HAFFEY: Objection, your Honor. Ask that it be stricken.

"Q. —for a case that—

"MR. HAFFEY: Objection.

"THE COURT: Overruled.

"Q. —for a charge that occured [*sic* ] on July 4th, 1994?

"MR. HAFFEY: Objection.

"THE COURT: Overruled.

"Q. Isn't that right?

"A. Yes.

"MR. KELLON: Nothing further."

■ Appellant argues that this question concerning another case would produce such issue confusion as to render the testimony irrelevant. This is mistaken. The fact that the witness would testify as an alibi witness in another case involving the defendant is a proper line of questioning as it goes to the witness's credibility and the trial court properly overruled the defense objections. This instance is not prosecutorial misconduct.

The twelfth instance of alleged misconduct occurred during the cross-examination of Dosha Jackson, where the following was stated after she testified that she and Danel were very close:

"Q. Did he [Danel] tell you things about himself?

"A. (Nodding affirmatively.)

"Q. Did he tell you that he was arrested on February—

"MR. HAFFEY: Objection, your Honor.

"THE COURT: Sustained.

"BY MR. KELLON:

"Q. Did you know he was arrested in February—

"MR. HAFFEY: Objection, your Honor.

"THE COURT: Sustained.

"BY MR. KELLON:

"Q. Ma'am, isn't it a fact that Danel and Demetrius were in a stolen car in February of 1994?

"A. Not to my knowledge, no.

"Q. If that were true, would he talk to you about that?

"A. Probably so, but I—

"Q. Okay.

"A. I don't know.

"Q. Has Danel ever been arrested before?

"A. Yes.

"Q. So he was probably arrested back in February of 1994?

"MR. HAFFEY: Objection, Judge.

"THE COURT: Sustained.

"A. I don't know.

"MR. HAFFEY: Ask that it be stricken, and the answer, too.

"THE COURT: It will be stricken. Ladies and gentlemen, disregard the question and answer."

■ Given the remainder of the other evidence, the negative responses elicited from the witness concerning whether she knew or would have been told by Danel that Danel had a prior arrest, and the prompt action by the court in striking the offending language and issuing a cautionary instruction to the jury, we cannot conclude that the prejudice was of such quality or quantity as to lead us to say that defendant was denied a fair trial.

The first assignment of error is overruled.

## II

"Appellant was deprived of his constitutional right to a fair trial and due process of law when the court committed reversible error by permitting the state of Ohio to introduce evidence of other acts of appellant and others which are prejudicial in nature."

■ In this assignment, appellant argues that the court erred in giving an instruction to the jury on "other acts" evidence because the evidence allegedly did not support the giving of such an instruction. Based on the testimony presented, which included evidence that appellant had multiple arrests for carjacking, the court did not abuse its discretion in issuing such an instruction where the identity of the perpetrator and the common scheme or plan used in the act of carjacking were at issue. See Evid.R. 404(B).

The second assignment of error is overruled.

## III

"The trial court committed error when it imposed separate sentences for appellant's separate convictions of grand theft and receiving stolen property of the same vehicle."

In this assignment of error, appellant argues that the three convictions herein should have been merged as allied offenses and the separate sentences for grand

theft (motor vehicle) and receiving stolen property (motor vehicle) should not have issued. Appellant bases this argument on his belief that the three convictions had a common animus, to wit, the carjacking of the red Taurus vehicle.

In analyzing whether offenses should be merged for sentencing purposes as allied offenses pursuant to R.C. 2941.25(A),[2] the Supreme Court of Ohio set forth the following standard of review:

"If the elements of the offenses correspond to such a degree that the commission of one crime will result in the commission of the other, the crimes are allied offenses of similar import and the * * * defendant's conduct is reviewed to determine whether the defendant can be convicted of both offenses. If the court finds either that the crimes were committed separately or that there was a separate animus for each crime, the defendant may be convicted of both offenses." *Newark v. Vazirani* (1990), 48 Ohio St.3d 81, 549 N.E.2d 520, syllabus.

Aggravated robbery is defined as follows at R.C. 2911.01(A):

"(A) No person, in attempting or committing a theft offense, as defined in section 2913.01 of the Revised Code, or in fleeing immediately after such attempt or offense, shall do either of the following:

"(1) Have a deadly weapon or dangerous ordnance, as defined in section 2923.11 of the Revised Code, on or about his person or under his control;

"(2) Inflict, or attempt to inflict serious physical harm on another."

Grand theft (motor vehicle) is defined as follows at R.C. 2913.02:

"(A) No person, with purpose to deprive the owner of property or services, shall knowingly obtain or exert control over either the property or services in any of the following ways:

"(1) Without the consent of the owner or person authorized to give consent;

"(2) Beyond the scope of the express or implied consent of the owner or person authorized to give consent;

"(3) By deception;

"(4) By threat."

Receiving stolen property is defined as follows at R.C. 2913.51:

---

**2.** R.C. 2941.25(A) provides:

"Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one."

"(A) No person shall receive, retain, or dispose of property of another, knowing or having reasonable cause to believe that the property has been obtained through commission of a theft offense."

 In the present case, appellant contends that the offenses of grand theft and receiving stolen property should be merged into the sentence received for aggravated robbery. We agree. The offenses were not committed separately. They were part and parcel of the same conduct, to wit, the carjacking of the vehicle, and there was no separate animus for each crime.

Accordingly, the assignment is affirmed and the convictions and sentences for the offenses of grand theft and receiving stolen property are vacated and the matter is remanded to the trial court to reflect the merger of the offenses on the record and resentence the appellant accordingly solely on the offense of aggravated robbery.

## IV

"The state of Ohio failed to prove beyond a reasonable doubt that the firearm was operable and the imposition of an additional three years for possession of a firearm must be reversed."

The following was stated in *State v. Mills* (1991), 73 Ohio App.3d 27, 29–30, 595 N.E.2d 1045, 1046–1047:

"In order for a defendant to be convicted of a firearm specification pursuant to R.C. 2929.71, the state must prove beyond a reasonable doubt that the firearm was operable or could readily have been rendered operable at the time of the offense. *State v. Gaines* (1989), 46 Ohio St.3d 65, 545 N.E.2d 68. Admission into evidence of the firearm allegedly employed in the crime is not necessary to establish the specification. Rather, the fact may be established by circumstantial evidence, such as testimony as to gunshots, smell of gunpowder, bullets, or bullet holes, etc. *Id.* Proof necessary to convict under R.C. 2929.71 can also be established by the testimony of lay witnesses who were in a position to observe the instrument and the circumstances surrounding the crime. *State v. Murphy* (1990), 49 Ohio St.3d 206, 551 N.E.2d 932. Nevertheless, there must still be some evidence relative to the gun's operability. *State v. Gaines, supra.*" (Footnote omitted.) See, also, *State v. Parker* (1991), 72 Ohio App.3d 456, 464–465, 594 N.E.2d 1033, 1038–1039.

 In the present case, Campbell testified that a gun was displayed briefly from beneath the waistband and shirt of the defendant and described the gun in general terms as being a dark-colored semi-automatic pistol. This brief display of the firearm under the circumstances can only be described as an implicit threat to coerce the victim into complying with the aims of the perpetrator. From this

brief act of brandishing the firearm the trier of fact could infer operability of the weapon. See *State v. Dixon* (1995), 71 Ohio St.3d 608, 646 N.E.2d 453 (expanding the criteria for operability as contained in *State v. Murphy, supra,* to include implicit threats). Accordingly, the trial court did not err in imposing the additional three years' incarceration for the firearm specification.

The fourth assignment of error is overruled.

## V

"The trial court erred when it failed to grant appellant's motion for acquittal under Crim.R. 29(A) relative to the count of receiving stolen property."

Due to the analysis contained in the third assignment of error above, this assignment, which is advanced in the alternative should the third assignment be overruled, is denied as moot.

The judgment is affirmed in part and reversed in part, and the cause is remanded.

*Judgment accordingly.*

PATTON, C.J., and PATRICIA A. BLACKMON, J., concur.