JOURNAL ENTRY AND OPINION
Appellant, Mario Odom, challenges the jury verdict entered by Judge Janet R. Burnside finding him guilty of murder for the shooting death of Tracy Denise Grant, in violation of R.C.2903.02. Odom asserts the ineffectiveness of trial counsel, the prosecutor's conduct, the sufficiency of the evidence, and failure to instruct the jury on the elements of involuntary manslaughter as error. We disagree and affirm.
On May 6, 1997, in response to a 911 emergency call, paramedics entered Tracy Grant's second-floor apartment at 3294 East 93rd Street in Cleveland, Ohio. James Hummel, a paramedic for the Division of Emergency Medical Services (EMS), testified that he and his partner found Grant lying unconscious in the hallway of the apartment, partially blocking the door. They discerned no life signs from Grant but began treating her, finding a small puncture wound below her left breast but no exit wound. They immediately transported her to St. Luke's Hospital where she was pronounced dead.
At 1:31 p.m., Just as the ambulance left, Sergeant Tom Machesky, a Cleveland Police Officer, and his partner entered the open door of the apartment and encountered Odom and a young boy. Machesky noted that Odom was wearing a pair of blue pants but no shoes, socks, or shirt.
Odom told Machesky that he left the apartment at approximately 1:00 p.m. to purchase beer, returned 15 minutes later, and called 911 after finding Grant on the floor in the hallway of the apartment. He told Machesky that someone must have broken in.
Sheila Clayton, the next-door neighbor's babysitter, testified that she arrived for work around noon that day. While watching her 1:00 p.m. soap opera, she heard the sound of adult voices arguing, and then she heard a noise sounding like a "boom" coming from the Grant apartment. She estimated that about five minutes after she heard this noise, Odom began banging at the door. Clayton spoke to Odom through the window, telling him that the neighbors were not in. She testified that he was clothed in jeans but wore no shirt. Detective Jack Bornfeld of the Cleveland Police Homicide Unit found no visible signs of forced entry into the Grant apartment. While investigating the wooden stairs located in the back of the apartment building, specifically the stairwell leading into the basement, he found three live .32 caliber shells and, wedged between two automobile tires, a five-shot .32 caliber revolver with a duct-taped grip and a missing cylinder pin. The gun also contained a spent .32 caliber shell casing.
Detective Donald J. Meel, an evidence technician for the Special Investigations Unit (SIU) of the Cleveland Police Department, processed the evidence at the scene. He testified that he lifted a print off of the gun, although he did not remember from which part of the gun. When asked whether prints could be lifted off of duct tape, he said that it is difficult but not impossible. He conceded that he found no evidence that someone deliberately wiped prints from the gun. Further, given the quality of the lifted print, Detective Edward Prinz of the Latent Fingerprint Section of SIU could not identify the print as either that of Odom or Grant.
Detective Daniel Rowley, a firearms and tool mark examiner of the Forensic Laboratory Unit of the Cleveland Police Department, testified that the gun was not of good quality. He pointed out that the barrel moved around a little, and that one side of the grip and the cylinder pin were missing. In order to safely test fire the .32 caliber gun, Rowley had the department make a pin to fit the gun. Without a pin, he explained, the gun would not properly fire and could blow up in the user's hand. He admitted, however, that even absent the pin, the cylinder would be in a position to fire if the user tilted the gun parallel to the floor.
The test fire of the gun revealed that the individual and class characteristics of the test bullet matched the bullet removed from Grant's body. It also revealed that the test shell casing matched the one found in the gun at the time of the investigation.
Dr. Stanley Seligman, M.D., Cuyahoga County Deputy Coroner, conducted an autopsy of Grant's body. Based upon his examination, he ruled the death a homicide. He testified that the bullet, which entered through the lower left chest, fractured her fifth rib, grazed the upper part of her liver, traveled through the heart and left lung, and came to rest in her back just above her fourth rib. The gunshot wound and visceral perforations resulted in her death. He also found a deposit of black soot, called "fouling," on her right wrist. He explained that fouling results from a cloud of carbon produced by the combustion of gunpowder. Fouling appears on a body when it is less than one foot away from the gun. He noted that revolvers expel fouling from both its muzzle and cylinder.
Dr. Seligman also testified that he did not find evidence of stippling" on Grant's skin. When a gun is fired, he explained, partly burned and burning gunpowder escapes from the muzzle of the gun. When the gun is closer to the body than 2 1/2 to 3 feet, a deposit of burned gunpowder or "stippling" will occur on the exposed skin.
According to Dr. Seligman, in order for Grant's wrist to have received the fouling deposit and the wound to reveal no signs of stippling, Grant's hand had to have been in a position out in front of and away from her body to be close enough to the gun. He admitted that such a stance could be consistent with a defensive gesture or with a struggle.
Elizabeth Lansky, a forensic scientist with the Coroner's office, conducted various tests upon Grant's clothing and skin. She noted that the shirt worn by Grant at the time of the shooting had three "defects" or holes in it which corresponded to the one wound. She theorized that the holes were caused from the bullet having passed through a fold in the clothing. Lansky also testified that she performed a Greis Test on the shirt to ascertain the presence of burned or partially burned gunpowder. Based upon the results of that test, Lansky concluded that the muzzle of the gun which fired the bullet into Grant was held at a distance of 18 to 24 inches. She later admitted that the distance could be less than one foot or more than two feet.
Lansky also testified that she conducted an Anatomic Absorption Test to determine the presence of barium and antimony, two substances present in the primer of bullets. The test revealed that the backs of both of Grant's hands and wrists were consistent for gunshot residue, although the results from her palms were not conclusive. Lansky also conducted a Trace Metal Detection Test to determine the presence of ferrous metal or iron, such as that used in the manufacture of a gun, but she stated that the results were negative. Negative results are not necessarily conclusive evidence that a person did not come in direct contact with iron, she explained, since a person may not react to the trace metal detection test. If tape covered the iron object, it would have a bearing on the results of that test.
Loretta Hunter, Grant's mother, testified that Odom moved into her daughter's apartment sometime in February 1997, about six months after her daughter met him. Hunter stated that she often visited Grant and her four grandchildren, and found that her daughter and Odom shared a "normal relationship": they kidded and joked, "and argued and stuff."
Grant's twelve-year-old son, Michael Grant, claimed he last saw Odom at the apartment before he left for school that morning. He saw Odom and Grant argue two or three times, but he did not remember seeing them argue in the weeks before his mother's death. He said that Odom would "put her up against the wall" when they argued, but he never saw Odom slap or hit Grant. Michael identified the gun as one he had seen on two occasions in Odom's possession. He said Odom told him that because the cylinder pin of the gun was missing, a person had to hold the gun sideways in order to fire it. The cylinder would fall out if held the normal way. He thought that Odom had shown him the gun a few days before the shooting.
Kenneth Bailey testified that he was a friend of Grant and had dated her on one occasion. He said that on the night before the shooting, he saw Odom and Grant arguing near a street corner and that Grant was crying in, what he characterized as, a "loud, crying out" yell. He said that she attempted to pull away from Odom and told him that she no longer wanted him living at her apartment. Bailey testified that he pulled his automobile up to the sidewalk and asked whether she was all right.
Although he found out about Grant's death on May 7, 1997, he did not tell anyone about witnessing the two argue until after he ran into Odom at the county jail in August 1997, about one week after Bailey had been picked up on a parole violation.[1] He admitted that he had been on parole for trafficking in cocaine and had previously been convicted of assault, and breaking and entering.
According to Bailey, Odom admitted that he placed the 911 call because he had shot Grant twice. He said Odom told him that he had asked one of Grant's children, present at the time of the shooting, to lie to police and tell them that someone had kicked in the door. Bailey also alleged that Odom had admitted to owning a 9mm handgun.
Bailey claimed that no one had promised to reduce pending criminal charges against him or give him any other deal in exchange for his testimony, but he admitted that he was hopeful that someone might make an offer.
Johnnie Mae Odom, Mario Odom's mother, testified in her son's defense. She said that in all of the conversations she had with Tracy, "[e]verything was fine."
While testifying in his own defense, Odom admitted that the .32 caliber revolver was his and that he lied to police about someone forcing their way into the apartment. He explained that Grant knew about the revolver and took it out of the bedroom cabinet about 11:00 a.m. the morning of May 6, 1997. He claimed that on the evening of May 5th, police officers came to their door looking for the previous tenant. The street entrance to the apartments was unlocked, and neither he nor Grant heard the officer's footsteps. Odom denied arguing with Grant that day, claiming that they joked about the possibility of robbers entering the building undetected and his "raggedy gun" that "won't do nothing anyway" offering little protection. Grant decided that she would fire a bullet in the ceiling, just to determine whether the gun would work. He said she sat on the couch while he knelt between her legs, telling her to stop playing with the gun and give it to him. After the gun went off about three or four inches from her chest, Grant told him to call 911, stood up, walked down the hallway, and fell to the floor. Odom called 911. On cross-examination, Odom admitted that he hung up the phone when the 911 operator asked him who shot Grant and that he did not answer the phone when the 911 operator called back.
After EMS arrived, he exited the back door of the apartment, took the gun down stairs and hid it between the tires because he was on parole at the time and was scared. He claimed that he had the gun only because the neighborhood was a high crime area, but he was trying to get rid of it. Odom explained that Michael Grant must have seen the gun when he had it out to show it to one of his friends, but he denied having shown Michael how to operate it. Odom also denied telling Bailey that he shot Grant; he said that he never intended for the gun to discharge and that Grant's finger pulled the trigger.
At the conclusion of Odom's testimony, the prosecution and defense made their closing arguments, and the judge instructed the jury on the charges. After deliberation, the jury returned a verdict against Odom as charged.
Odom's first and fourth assignments of error shall be considered together.
 I. FAILURE OF APPELLANT'S COUNSEL TO REQUEST BIFURCATION OF THE CHARGES CONSTITUTED PREJUDICIAL ERROR DENYING HIM A FAIR AND JUST TRIAL CAUSING THE JURY TO LOOSE [sic] IT'S [sic] WAY AND TO BE [sic] CONVICT HIM ON THE INFLUENCE [sic] OF HIS PRIOR CONVICTION.
 IV. MR. ODOM WAS DENIED HIS RIGHTS (SIC) TO EFFECTIVE ASSISTANCE OF COUNSEL GUARANTEED BY ARTICLE I, SECTION 10 OF THE OHIO CONSTITUTION AND THE SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATE[S] CONSTITUTION.
Odom argues that his trial counsel's failure to ask the judge to bifurcate his trial on the murder and disability charges resulted in prejudicial error because the jury heard testimony on his previous robbery conviction. According to Odom, this testimony obviously influenced the jury's decision in finding him guilty on the murder charge. He claims the failure to bifurcate the trial was so prejudicial, that even the court's instruction to the jury to ignore evidence of a prior conviction did not alleviate such an error.
Odom then contends that his counsel's trial tactics were "disastrous." He first takes issue with the opening statement, claiming that counsel failed to point out the weaknesses in the state's case and that he failed to develop, for the jury, both a mental picture about the incident and Odom's contention that Grant's death was accidental. He further maintains that the closing argument was equally as ineffective.
Odom also complains that counsel introduced little evidence, failed to cross-examine witnesses on their inconsistent testimony, and failed to elicit testimony from the state's witnesses in support of Odom's theory of events. He asserts that counsel failed to file motions requesting additional evidence or ask the judge to suppress "useless" fingerprint evidence. Finally, he claims that counsel failed to object to a time restraint on closing arguments or to the denial of the request for an involuntary manslaughter charge.
This Court reviews a claim of ineffective assistance of counsel under the two-part test set forth in Strickland v. Washington
(1984), 466 U.S. 668, 104 S.Ct. 2052. See, also, State v.Tollivar (July 31, 1997), Cuyahoga App. No. 71349, unreported;State v. Bradley (1989), 42 Ohio St.3d 136, 538 N.E.2d 373. UnderStrickland, a reviewing court will not deem counsel's performance ineffective unless the defendant can show that counsel's performance fell below an objective standard of reasonable representation and that prejudice arose from counsel's deficient performance. Bradley, supra paragraph one of the syllabus. To show such prejudice, the defendant must prove that if not for counsel's errors, a reasonable probability exists that the result of the trial would have been different. Id. at paragraph two of the syllabus. Judicial scrutiny of counsel's performance must be highly deferential, and the reviewing court must refrain from second-guessing counsel's trial strategy. State v. Sallie (1998),81 Ohio St.3d 673, 674, 693 N.E.2d 267; State v. Williams (1991),74 Ohio App.3d 686, 695, 600 N.E.2d 298, 304. "`[A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance * * *.'"Bradley, supra, quoting Strickland, supra.
With regard to Odom's first assignment of error, this Court has reviewed the transcript and determined that trial counsel did, in fact, raise the issue of bifurcation of both charges. Although the judge was amenable to the idea, the prosecuting attorney stated that the jury would hear the testimony regarding the robbery regardless of whether the judge granted Odom's request. The prosecuting attorney also stated that if Odom pleaded to Count 2, having a weapon under a disability, the state would use it against him for impeachment purposes in the separate trial on the murder charge.
The transcript reveals that counsel discussed the advantages and disadvantages of a guilty plea with Odom. After these discussions, counsel stated to the judge that Odom wanted to "leave Count 2 in just as it is," thereby agreeing to be tried on both charges before one jury. Because the error of which Odom complains does not exist, his first assignment of error is without merit.
As to the fourth assignment of error, this Court first notes that all of the errors of which he complains involve questions of trial tactics. Secondly, Odom has neither provided this Court with citation in the transcript to these alleged errors nor articulated how or why these tactical decisions where objectively deficient as required under the first prong of the Strickland
test. Sallie, supra. As such, this Court may disregard this assignment of error. App. R. 12(A) (2).
In any event, this Court concludes, after careful review of the record, that trial counsel's conduct did not fall below an objective standard of reasonable representation. Bradley, paragraph one of the syllabus. Because Odom has failed to satisfy the first prong of the Strickland test, this Court cannot find that trial counsel rendered constitutionally ineffective assistance in defense of the charges against Odom. This fourth assignment of error is also without merit.
Odom's second assignment of error states:
 II. THE PROSECUTOR'S MISCONDUCT VIOLATED MR. ODOM'S RIGHTS TO A FAIR TRIAL GUARANTEED BY THE DUE PROCESS PROVISIONS OF ARTICLE I, SECTION 16 OF THE OHIO CONSTITUTION AND THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION.
Odom asserts that the prosecutors not only withheld evidence from the defense, they also made improper statements during trial. When the prosecution withholds material, exculpatory evidence in a criminal proceeding, such suppression violates the defendant's Fourteenth Amendment right to a fair trial. State v.Johnson (1988), 39 Ohio St.3d 48, 60, 529 N.E.2d 898, 911, citingBrady v. Maryland (1963), 373 U.S. 83, 83 S.Ct. 1194. When reviewing assertions of prosecutorial misconduct in connection with the prosecutor's alleged suppression of evidence, the key issue is whether the evidence suppressed is material. Id. Such evidence is material only if a reasonable probability exists that the result of the trial would have been different had the prosecution disclosed such evidence to the defense. Id. The "reasonable probability" test applies in all cases where the defense alleges that the prosecution improperly suppressed evidence, regardless of whether the defense specifically or generally requested the evidence or made no request for the evidence. Id.
First, Odom alleges that the prosecution failed to produce witness statements made to the police by Sheila Clayton, Michael Grant, and Kenneth Bailey. A careful reading of the record reveals that the judge specifically asked the prosecution whether these witnesses had given written statements subject to a Crim.R. 16(B) (1) (g) in camera inspection. The prosecutor denied the existence of any such statements, and Bailey had also denied giving a written statement. Even if these statements did, in fact, exist, Odom has failed to articulate how these statements would be material to the creation of a reasonable probability that the result of the verdict would have been different had they been disclosed. Id.
Odom further argues that while "numerous tests were run on him," the prosecution failed to produce the results. However, Odom has neither identified these "tests" nor provided this Court with citation to his testimony about these tests. This Court's independent review of the transcript also fails to disclose testimony regarding such tests. Had he undergone "tests" and the prosecution withheld the results from the defense, Odom has again failed to articulate how these results would be material in creating a reasonable probability that the result of the verdict would have been different had the defense known of such results.Id.
As noted above, Odom also argues that the prosecutors made improper statements during the course of trial. When reviewing allegations of prosecutorial misconduct pertaining to comments made during trial, this Court considers whether the prosecutor's remarks are improper and, if so, whether these remarks prejudicially affected the substantial rights of the accused.State v. Smith (1984), 14 Ohio St.3d 13, 14, 470 N.E.2d 883,885. See, also, State v. Lott (1990), 51 Ohio St.3d 160, 165,555. N.E.2d 293, 300; Tollivar, supra. "A prosecutor is at liberty to prosecute with earnestness and vigor, striking hard blows, but may not strike foul ones." Smith, supra. Prosecutors may not express an opinion on the guilt of the accused. Lott,supra. They also must avoid insinuations or assertions calculated to mislead the jury and refrain from alluding to matters not supported by admissible evidence. Id. If the prosecutor's behavior is deemed improper, the reviewing court must determine whether such behavior resulted in a denial of due process. Statev. Keenan (1993), 66 Ohio St.3d 402, 410, 613 N.E.2d 203, 209. The reviewing court must consider the effect of the misconduct on the jury within the context of the entire trial. Id. One factor relevant to this analysis is whether the misconduct constituted a "trivial error," i.e., whether it was an isolated incident in an otherwise properly tried case." Id.; Tollivar (July 31, 1997), Cuyahoga App. No. 71349, unreported. The failure to object to an improper comment from the prosecution waives appellate review unless such statement constitutes plain error. Lott, supra. In order to prevail under a standard of plain error, Crim. R. 52(B), appellant must establish that the outcome of his trial would clearly have been different hat the elleged errors not occurred.State v. Woddell (1996), 75 Ohio St.3d 163. "Notice of plain error is to be taken with the utermost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." State v. Landrum (1990), 53 Ohio St.3d 107.
The line of questioning complained of by Odom consists of the following:
 Q: [By Prosecutor Glickman] Did the defendant tell you why he called the police?
 A: [By Kenneth Bailey] Yes, because she was shot twice. But he was saying that he called the police because he had did it, but he had kicked in the door to make it look like somebody else had did it.
 Q: Did he tell you who, if anyone else, was at home when he kicked Miss Grant?
A: The kid was there, a little boy.
 Q: Did he tell you what, if anything, he said to the little boy?
 A: Yes. He said to say somebody kicked in the door. [Emphasis added.]
Defense counsel failed to object to the form of the question. As such, Odom has waived this assignment of error. Lott, supra.
Even if counsel had properly preserved this issue, the prosecutor's juxtaposition of "Miss Grant" for "in the door" appears to be inadvertent rather than a purposeful attempt to mislead the jury.
Odom also argues that the personal attacks on him by the prosecutor during his cross-examination resulted in prejudice, pointing to the following line of questioning:
 Q: [By Prosecutor Glickman] And I take it that you feel great remorse for what [Grant's mother] must be going through?
A: [By Mr. Odom] Yes, I do.
 Q: Did you take the opportunity to pick up the telephone and call them up and say, "I am sorry," and let them know how their daughter died?
 A: I can say, from my attorneys, I was told not to speak to anyone.
 Q: When is the first time that you talked to an attorney, sir?
A: I think it was the next day * * *
 Q: Okay. On May 6th, that day from jail, did you call up Tracy Grant's mother?
A: No, I didn't.
 Q: And let her know what happened to her? Did you ever let her know how sorry you were?
A: I haven't talked to Mrs. Grant since I have been in here.
 Q: At any point have you told anyone this story about Tracy Grant shooting herself? No, you didn't, sir?
A: No, I didn't.
 Q: And you didn't tell people that story because you have sat here during this trial and listened to the testimony, have you not?
A: Yes, I did?
* * *
 Q: And the reason that you hadn't told anybody about this event is because by making up this ridiculous lie is the only way that you think there is a chance that you can get away with this crime; isn't that true?
A: No, it isn't.
 Q: No, it isn't? Sir, you had over the past months dozens and dozens of opportunities to bring these facts to the various members of law enforcement?
Mr. Zucco: Objection.
Court: Sustained. Next question.
Odom argues that the prosecutor's characterization of him as a liar inflamed the jury and resulted in prejudice. The limits of an attack on a witnesses' credibility are governed by the rules of evidence. State v. Ingram (July 9, 1992), Cuyahoga App. No. 60072, unreported; see Evid.R. 607 to 609. On cross-examination, the prosecution may properly test the credibility of an accused regarding a matter to which the accused testified upon direct examination. State v. Gest (1995), 108 Ohio App.3d 248, 257-258,670 N.E.2d 536, 543. Without an objection to the allegedly improper line of questioning, the matter is waived for appellate review unless the defendant can show plain error. Id.
In the present case, Odom testified on direct examination that Tracy Grant's death resulted from an accidental discharge of the weapon. The questioning set forth above shows that the prosecutor intended to reveal the incredibility of Odom's testimony, i.e., that it was a matter of recent fabrication rather than a truthful depiction of the events surrounding Grant's death. Because the prosecutions's questions were proper in the context of cross-examination, Odom's contention is without merit.
With regard to the prosecutor's question about Odom's alleged failure to tell authorities his rendition of the facts of the incident, defense counsel properly objected and the court properly sustained that objection. The judge also instructed the jurors that they could not "draw inferences or speculate on the truth of any suggestions included in a question that was not answered by the witness." At most, this incident constitutes a trivial error, properly cured in an otherwise properly tried case. Keenan, supra. See, also, Tollivar, supra.
Finally, Odom argues that the prosecution's closing argument was improper. Early in its closing argument, the prosecution stated as follows:
 Once the evidence clearly shows that he is the killer, then Mr. Odom comes up here and just literally turns this courtroom into a playground of lies. And we will talk more about Mr. Odom and his fantasy, as to what the evidence is in this case as we go along.
Odom has not articulated why this statement is improper, other than it attacks his credibility. In addition, trial counsel failed to object to the statement. As such, Odom has waived appellate review of this error. Lott, supra.
Odom's third assignment of error states:
 III. MR. ODOM'S RIGHTS UNDER ARTICLE I, SECTION 16
OF THE OHIO CONSTITUTION AND THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION WERE VIOLATED AND [sic] HE WAS IMPROPERLY DENIED A RULE 29 ACQUITTAL AND WAS CONVICTED BY THE JURY WHEN HIS CONVICTIONS WERE NOT SUPPORTED BY SUFFICIENT EVIDENCE.
Criminal Rule 29(A) provides that the judge may, upon the motion of the defendant, or his own motion after the close of evidence on either side, order the entry of a judgment of acquittal of one or more of the offenses charged if the evidence is insufficient to sustain a conviction on the offense or offenses. "The purpose of a motion for judgment of acquittal is to test the sufficiency of the evidence and, where the evidence is insufficient, take the case from the jury." Dayton v. Rogers
(1979), 60 Ohio St.2d 162. When ruling on a Rule 29 motion for judgment of acquittal, the judge must view the probative evidence in a light most favorable to the prosecution and determine whether it has presented sufficient evidence on each essential element of the charged offense. State v. Perkins (1994), 93 Ohio App.3d 672,680, 639 N.E.2d 833, 840. A trial court should not grant a motion for acquittal when the evidence is such that reasonable minds can reach different conclusions as to whether each material element of a crime has been proven beyond a reasonable doubt. Id.; see, also, Jenks, supra, paragraph two of syllabus.
Odom argues that the prosecution presented no direct or circumstantial evidence to show that he had the specific intent to murder Tracy Grant. Section 2903.02(A) of the Ohio Revised Code provides that "[n]o person shall purposely cause the death of another or the unlawful termination of another's pregnancy." Under Ohio law, a person accused of murder may be convicted solely on the basis of circumstantial evidence. State v. Nicely
(1988), 39 Ohio St.3d 147, 154-155, 529 N.E.2d 1236, 1242-1243. Circumstantial evidence is no less probative than direct evidence. Id. at 151., However, where the prosecution relies upon circumstantial evidence alone "to prove an element essential to a finding of guilt, there is no need for such evidence to be irreconcilable with any reasonable theory of innocence in order to support a conviction." Jenks, supra, paragraph one of the syllabus.
Odom argues that both the coroner's report and the trace element report support his assertion that Grant accidentally caused her own fatal wound. He also argues that the failure to test fire the gun under conditions similar to those when Grant died highlights the possibility of accidental death.
Even if this Court considered these reports and lack of a similar-condition test fire consistent with Odom's theory that he lacked the specific intent required by R.C. 2903.02(A), additional evidence presented by the prosecution shows intent. First, as Odom conceded, the gun had to be held in an position tilted to the left and parallel to the floor in order to fire. Second, the next-door babysitter, Clayton, heard adult voices arguing shortly before she heard a "boom" coming from the Grant apartment. Third, Odom admitted that he lied to police about the events surrounding Grant's death and hiding the gun. Finally, Odom admitted both that he hung up the phone after the 911 operator asked him who shot Grant and that he refused to answer the telephone when the 911 operator called back.
Odom's knowledge of the difficulty in firing the weapon, his failure to explain how Grant shot herself accidentally in light of the scientific evidence presented, the short span of time between the sounds of arguing and the "boom," and Odom's attempts to avoid detection are all indicative of intent. In addition, Odom's act of hanging up the telephone in response to the operator's question and his refusal to pick up the phone tend to show his guilt for Grant's injury. Viewing the probative evidence in a light most favorable to the prosecution, this Court concludes there was sufficient evidence to show intent. Perkins,supra. Therefore, Odom's third assignment of error is overruled.
Odom's fifth assignment of error provides as follows:
 IV. THE COURT ERRED IN DENYING APPELLANT'S JURY INSTRUCTION FOR AN INVOLUNTARY MANSLAUGHTER CHARGE AS A LESSER INCLUDED OFFENSE BY FINDING IT TO BE AN INFERIOR OFFENSE.
Contrary to Odom's contention, the judge did not refuse to instruct the jury on a charge of involuntary manslaughter because it was an "inferior offense" of murder. Rather, she denied the instruction for two different reasons. First, she concluded that an involuntary manslaughter charge was not justified by the evidence and, secondly, it was improper to use the offense of having a weapon under a disability, R.C. 2923.13, as the requisite felony in the definition of involuntary manslaughter under R.C. 2903.04. Because this Court agrees with the judge's first reason, it will not address the second reason for excluding the charge. App.R. 12(A) (1) (c).
"Even though an offense may be statutorily defined as a lesser included offense of another, a charge on such lesser included offense is required only where the evidence presented at trial would reasonably support both an acquittal on the crime charged and a conviction upon the lesser included offense." State v.Thomas (1988), 40 Ohio St.3d 213, 533 N.E.2d 286, paragraph two of the syllabus; State v. Braxton (1995), 102 Ohio App.3d 28, 43,656 N.E.2d 970, 980. "If the evidence adduced on behalf of the defense is such that[,] if accepted by the trier of fact, it would constitute a complete defense to all substantive elements of the crime charged, the trier of fact will not be permitted to consider a lesser included offense." Braxton, supra at 43-44; seeState v. Solomon (1981), 66 Ohio St.2d 214, paragraph two of the syllabus.
As noted above, R.C. 2903.02(A) provides that "[n]o person shall purposely cause the death of another * * *" Odom testified that Grant accidentally shot herself and if the jury accepted his testimony as true, it would constitute a complete defense to the murder charge. In addition, the evidence as discussed above could not have supported both an acquittal on the murder charge and a conviction upon an involuntary manslaughter charge. Because Odom denied that he caused Grant's death and the evidence did not support the charge, Odom was not entitled to an involuntary manslaughter instruction and the judge properly denied his request. See State v. Palmer (1997), 80 Ohio St.3d 543, 562-563,687 N.E.2d 685. Accordingly, Odom's fifth assignment of error is overruled.
Judgment affirmed.
It is ordered that appellee recover of appellant costs herein taxed.
The Court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this Court directing the Cuyahoga County Common Pleas Court to carry this judgment into execution. The defendant's convictions having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
DIANE KARPINSKI, J., CONCURS;
 ANN DYKE, PRESIDING JUDGE. CONCURS SEPARATELY.
 _____________________ JUDGE ANNE L. KILBANE
[1] Detective Bornfeld testified that he spoke with Bailey sometime in December 1997 about Odom's alleged statements.
 CONCURRING OPINION