JOURNAL ENTRY and OPINION.
{¶ 1} Defendant-appellant Lavelle Moore appeals his convictions for aggravated burglary, aggravated robbery, and kidnapping. We find merit to the appeal in part and vacate Moore's sentence and remand the case for resentencing.
 {¶ 2} Moore and co-defendant, Eugene Barrow, were indicted for aggravated burglary, aggravated robbery, kidnapping, and felonious assault, each including firearm specifications.[1] The following evidence was presented at their jury trial:
 {¶ 3} The victim, Olivia Penn, testified that on March 23, 2001, she was nine months pregnant and living in a duplex on Paxton Avenue with her boyfriend, Rashee McLaurin. On that day, Dallas King and Tonja Snyder came to her apartment to inquire about renting the upstairs unit. McLaurin was out-of-town. Penn showed King and Snyder her apartment, which had the same layout as the upstairs apartment. About a half hour after King and Snyder left, they returned and told Penn that they had lost their keys. They looked around her apartment for the keys and King used the phone to call AAA. While King was on the phone, Snyder used the bathroom.
 {¶ 4} Penn testified that when she went back to the front room, she saw two men with their mouths covered by masks. One of the men, later identified as Moore, told her, "Lay it down. Lay it down," while pointing a gloved hand at her head like a gun. She spun around and saw that King had a real gun pointed at her head. She immediately laid down while a man she later identified as Barrow, hog-tied her by duct-taping her hands and feet together. He also placed duct tape around her eyes and nose. When she told him she could not breathe, he removed the tape from her nose.
 {¶ 5} According to Penn, after she was restrained, the men asked her, "Where's the money? Where's the money? Where's Rashee?" The men ransacked the home and took jewelry, money from a safe, and part of a gun. She heard one of the men say, "Come on Tonja."
 {¶ 6} After they left, Penn was able to escape from the duct tape. She then called her landlord and 911. Penn gave birth five days later.
 {¶ 7} Officer Martina Latessa testified the police processed the scene for fingerprints. According to Penn, King and Snyder were not wearing gloves and she had given them each a beverage from a glass. The other men were wearing gloves. Tonja Snyder's fingerprints were recovered from one of the glasses. A notebook was also found containing the names of Tonja Snyder, Dallas King, and "Heavy," aka Moore. It also contained a sketch of the man that Penn identified as the man who came to look at the apartment, Dallas King. He was wearing the same dog chain necklace in the sketch that he wore during the robbery.
 {¶ 8} According to Officer Latessa, the police were still processing the scene when Rashee McLaurin returned home. He went to the bedroom, where he picked up a box and looked in it. He was told to put down the box because it was not processed yet. He complied and, when the police looked inside, they found 270 grams of cocaine and a large amount of marijuana. McLaurin and Penn were charged with possession of drugs. McLaurin pled guilty to the charge, and the charge against Penn was dismissed.
 {¶ 9} Officer Rehor testified that three days after the robbery, he made a traffic stop of a car in which Snyder and King were riding. He recognized King's name as a suspect in the robbery and arrested him and Snyder.
 {¶ 10} Approximately one month after being arrested, King approached the police and told them that he, Snyder, "Heavy," aka Lavelle Moore, and Eugene Barrow, were involved in the robbery. They were all arrested.
 {¶ 11} On August 1, 2001, Penn identified Moore in a photo array as one of the men who robbed her, and she later identified him in a line-up.
 {¶ 12} After McLaurin pled, he was also shown a photo array and recognized Barrow as a cousin of his friend, "Fat Man." According to McLaurin, "Fat Man" knew about McLaurin's having the drugs and the money in his house because "Fat Man" had given him a large quantity of drugs as collateral for a $5,000 loan.
 {¶ 13} Dallas King testified that he was currently in jail for the robbery. According to King, on the day of the robbery, he and Tonja Snyder met with Moore and Tefawn Myers in the early afternoon. Moore told King that he knew of an apartment they could rob on Paxton Avenue. They set up their plan to ask about the upstairs apartment. According to King, after looking at the apartment, he reported back to Moore and told him that the woman was home and that she had a dog. They then decided he and Snyder would go back in to say they lost their keys.
 {¶ 14} King testified that after looking for the keys in the apartment, he then used the woman's telephone to page Moore. He then went to the bathroom to get Snyder. By the time he returned to the front room, Moore was in the apartment holding a gun to Penn's head and telling her to lie down. Penn's dog was placed in the closet. King testified that Barrow then restrained the woman with duct tape. According to King, they took a rifle from the bedroom closet and a metal safe that Barrow had found under the bed. In the safe was $14,000, which Barrow, Moore, and King split between them.
 {¶ 15} King testified that Moore and Barrow were not wearing masks at the time of the robbery, but hooded sweatshirts. King admitted that he was mad at Moore for not posting his bail after he was arrested and admitted that he did not make a statement to the police implicating Moore until he had been held in jail for approximately one month.
 {¶ 16} Tefawn Myers testified that she had a child with King. She stated that Moore and King were cousins. On the day of the robbery she was with Moore when they met King and Snyder. She overheard the men discussing the plan to rob someone. Later that evening, when she saw King at his sister's birthday party, she noticed he had a large amount of cash. She admitted on cross-examination that she initially did not tell police that Moore was involved in the robbery, because she did not want to implicate him if they were not investigating the same robbery. She also stated that she was reluctant to give information, because she was afraid of Moore, who had gone to prison for shooting his best friend.
 {¶ 17} Tonja Snyder testified that she was King's girlfriend at the time of the robbery. She admitted she went to the duplex to look at an apartment, but claimed she knew nothing about the robbery plans. She stated that she never met with Moore or Myers prior to going to Paxton Avenue, which conflicted with the testimony of both Myers and King. She stated that when she came out of the bathroom she was shocked to see Barrow taping the woman. She also claimed that Barrow had a gun and he grabbed her by the arm and while pointing the gun at her stomach, told King, "You better tell your girl how Cleveland really is." Snyder identified Moore and Barrow from photos.
 {¶ 18} On cross-examination, she admitted that although she testified that Moore was present, she never told the police this during her initial statement.
 {¶ 19} The jury found Moore guilty of aggravated burglary, aggravated robbery, and kidnapping. Moore was found not guilty of felonious assault and the firearm specifications. The trial court sentenced Moore to ten years on each count, to run concurrently. The court also imposed an additional ten consecutive years because Moore was a repeat violent offender.
 {¶ 20} Moore appeals, raising sixteen assignments of error.
 Other Act Evidence {¶ 21} Moore contends in his first assignment of error that he was denied a fair trial by the State's witnesses' references to his prior criminal record.
 {¶ 22} Moore contends Myers' testimony regarding the fact that he had spent time in prison before, was prejudicial. The record indicates, however, that defense counsel cross-examined Myers regarding the fact that she was originally hesitant to implicate Moore. Initially, she did not tell the police about hearing Moore discuss the robbery and she also refused to talk with Moore's attorney. On redirect, the prosecutor elicited that Myers was hesitant to implicate Moore because she was fearful of him because he had gone to prison for shooting his best friend, and therefore would not hesitate to hurt her. She then clarified that since Moore was in jail, she was not afraid of him, but she feared the people he knew who could retaliate against her on his behalf.
 {¶ 23} The introduction of evidence of other bad acts can be prejudicial and is generally prohibited by Evid. R. 404(B). See, e.g.,State v. Curry (1975), 43 Ohio St.2d 66, 68-69. Prejudicial error will not be found, however, when the defense "opens the door" to this evidence. See State v. Greer (1988), 39 Ohio St.3d 236, 243; State v.Hartford (1984), 21 Ohio App.3d 29, 31. Accordingly, because the defendant opened the door to Myers' testimony, we do not find it constitutes reversible error.
 {¶ 24} Moore also contends that the fingerprint examiner testified about Moore's prior criminal record by indicating that she compared the prints from the crime scene to the defendants' "jackets." Given the fact that "jackets" is not a well-known term, the reference was not prejudicial. The trial judge did not know what the term "jackets" meant. Furthermore, at the time the fingerprint analysis was performed, Moore was already in custody. Therefore, the reference to "jackets" could also have related to the prints taken during the booking process. Accordingly, no prejudice resulted from this reference.
 {¶ 25} Moore contends that the prosecutor's questioning Snyder about what she observed Moore doing a week prior to the robbery was also prejudicial. However, the trial court called a sidebar once an objection was made, and Snyder was not permitted to answer the question. Therefore, the jury never heard what Moore was doing and no prejudice resulted. Furthermore, the fact that Snyder testified she was scared to testify was not prejudicial given the evidence incriminating Moore.
 {¶ 26} Moore also objects to the prosecutor's asking Officer Rehor, "These individuals * * * are not what you would classify as the cream-of-the-crop, right?" (TR. 682). However, this reference was made regarding Officer Rehor's arrest of King and Snyder after making a traffic stop. Therefore, the reference had nothing to do with Moore and was not prejudicial to him.
 {¶ 27} Moore's first assignment of error is overruled.
 Prosecutorial Misconduct {¶ 28} Moore argues in his second assignment of error that the prosecutor engaged in misconduct during closing argument by telling the jury that he believed that Moore was guilty, giving the wrong definition of aiding and abetting, inappropriately surmising why King named Moore as one of the participants of the robbery, and appealing to the jury's passion and prejudice.
 {¶ 29} A prosecuting attorney's conduct during trial does not constitute grounds for error unless the conduct deprives the defendant of a fair trial. State v. Keenan (1993), 66 Ohio St.3d 402-405; State v.Gest (1995), 108 Ohio App.3d 248, 257. The touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor. Smith v. Phillips
(1982), 455 U.S. 209. The effect of the prosecutor's misconduct must be considered in light of the whole trial. State v. Durr (1991),58 Ohio St.3d 86, 94; State v. Maurer (1984), 15 Ohio App.3d 239, 266.
 {¶ 30} Moore claims the prosecutor engaged in misconduct by appealing to the jury's emotions by stating that the State's witnesses had to "live with" the jury's verdict and also by commenting on the fact that he believed Moore was guilty.
 {¶ 31} The Ohio Supreme Court has held that prosecutors are granted wide latitude in closing arguments. State v. Maurer (1984),15 Ohio St.3d 239, 269, certiorari denied (1985), 472 U.S. 1012. In order for a prosecutor's closing argument to be prejudicial, the remarks must be "so inflammatory as to render the jury's decision a product solely of passion and prejudice." State v. Williams (1986), 23 Ohio St.3d 16, 20, certiorari denied (1987), 480 U.S. 923.
 {¶ 32} We do not find the jury in the instant case was so inflamed by the prosecutor's comments. There was sufficient evidence provided by the testimony of both the victim and Moore's co-defendants regarding Moore's involvement in the robbery.
 {¶ 33} The prosecutor's statement that he believed Moore was guilty and that he believed King implicated Moore because Moore was involved, was in response to defense counsel's assertion during closing that he believed Moore was innocent and was wrongly accused by King because Moore refused to post bail to get him out of jail.
 {¶ 34} The prosecutor informed the jury that complicity and aiding and abetting occur where "two or more people are acting in concert to perfect a goal, they can all be held responsible for the result of that activity. It's called aiding and abetting," and also stated, "They are responsible for the natural consequences of their actions, the natural foreseeable probable consequences from their actions." However, this was not error because the prosecution's definitions mirrored the instructions in OJI and the jury was later instructed more fully by the trial court on these points.
 {¶ 35} Moore's second assignment of error is overruled.
 Jury Instructions {¶ 36} In his third assignment of error, Moore contends the trial court erred by instructing the jury regarding aiding and abetting because it did not identify anyone as the principal offender and also improperly led the jury to believe that mere presence of the accused was sufficient to find Moore guilty.
 {¶ 37} A review of the record indicates that Moore did not object to the trial court's instructions. Therefore, absent plain error, this assignment of error is overruled. Crim. R. 30; State v. Spirko (1991),59 Ohio St.3d 1, 34. After reviewing the jury instructions in their entirety, as we are required to do, we find no plain error. State v.Price (1979), 60 Ohio St.2d 136, paragraph four of the syllabus ("[a] single instruction to a jury may not be judged in artificial isolation but must be viewed in the context of the overall charge.")
 {¶ 38} Under Ohio law, in order to constitute aiding and abetting, the accused must have taken some role in causing the commission of the offense. State v. Sims (1983), 10 Ohio App.3d 56. Mere presence at the scene is not enough. Id. at 58. Rather, a person aids when he assists another person in performing an act and a person abets when he encourages a person to act in a certain manner. Id. at 59. However, aiding and abetting may be shown by both direct and circumstantial evidence, and participation may be inferred from presence, companionship, and conduct before and after the offense is committed. State v. Cartellone (1981),3 Ohio App.3d 145, 150.
 {¶ 39} A review of the trial court's instruction reveals that the trial court properly instructed the jury in accordance with Ohio law. In fact, Moore had requested that the trial court give the instruction on aiding and abetting as set forth in OJI, and that is exactly what the trial court did.
 {¶ 40} Moore also contends the trial court failed to instruct the jury that mere presence was not enough. However, the trial court did instruct the jury, "The mere presence of an accused at the scene of a crime and the fact that the accused was acquainted with the perpetrator is not sufficient proof in and of itself that he was an aider and abettor." (TR. 1402).
 {¶ 41} Accordingly, the trial court sufficiently instructed the jury regarding "aiding and abetting" and Moore's third assignment of error is, therefore, overruled.
 Duplicitous Indictment {¶ 42} In his fourth assignment of error, Moore argues that because the court instructed the jury using the phrase "and/or" that the indictment was duplicitous.
 {¶ 43} "Duplicity" as the term is used in regard to criminal charges, is the joinder of two or more distinct offenses in one count. "The term duplicity in its strictest sense applies to the joinder of separate and distinct offenses in one and the same count." State v.Johnson (1960), 112 Ohio App. 124, 127. The test of duplicity is whether the proof of one offense will tend to establish guilt of the other. In applying this test, Moore has failed to show that the instructions on aggravated robbery and aggravated burglary were duplicitous.
 {¶ 44} When a statute states a number of ways disjunctively in which an offense may be committed, and the same punishment is prescribed for the crime regardless of whether it is committed in one or all of the ways named, an indictment may allege conjunctively the offense to have been committed in more than one way. A person who does all of the prohibited acts violates the statute once and incurs only one penalty.State v. Daniels (1959), 169 Ohio St. 87, paragraph three of syllabus;State v. Allen (June 3, 1993), Cuyahoga App. No. 62713; State v. Phenix
(Nov. 9, 1995), Ashtabula App. No. 95-A-0018.
 {¶ 45} In the instant case, the court did not err by instructing the jury as to aggravated robbery and aggravated burglary. Moore was convicted and sentenced for only one count of aggravated robbery and aggravated burglary.
 {¶ 46} Furthermore, we note that Moore failed to raise any objection to the indictments as required by Crim. R. 12(C)(2) and, therefore, waived any error that may have existed in the indictments.
 {¶ 47} Moore's fourth assignment of error is overruled.
 Sufficiency of the Evidence {¶ 48} In his fifth assignment of error, Moore argues the evidence was insufficient to support his convictions because the State's witnesses gave conflicting testimony regarding who possessed the gun and how the idea for the robbery evolved. He also argues that Penn's identification of Moore was suspect.
 {¶ 49} The standard of review with regard to the sufficiency of evidence is set forth in State v. Bridgeman (1978), 55 Ohio St.2d 261, syllabus:
 {¶ 50} "Pursuant to Criminal Rule 29(A), a court shall not order an entry of judgment of acquittal if the evidence is such that reasonable minds can reach different conclusions as to whether each material element of a crime has been proved beyond a reasonable doubt." See, also, Statev. Apanovitch (1987), 33 Ohio St.3d 19, 23; State v. Davis (1988),49 Ohio App.3d 109, 113. Bridgeman must be interpreted in light of the sufficiency test outlined in State v. Jenks (1991), 61 Ohio St.3d 259, paragraph two of the syllabus, in which the Ohio Supreme Court held:
 {¶ 51} "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence submitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. (Jackson v. Virginia [1979],443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560, followed.)"
 {¶ 52} Although there was conflicting evidence regarding who had the gun and how the robbery plan evolved, the witnesses agreed on the core facts supporting the crimes of which Moore was convicted: aggravated robbery, aggravated burglary, and kidnapping.
 {¶ 53} King, Snyder, and Penn testified that Moore was present when Barrow hog-tied the pregnant victim by taping her wrists to her ankles. This was a very precarious position in which to restrain a victim who was nine months pregnant and past her due date. If the stress had induced labor, the results might have been tragic. King, Snyder, and Penn also testified to the house being ransacked and money taken. Therefore, the evidence was sufficient to support Moore's convictions.
 {¶ 54} Penn's identification of Moore was not suspect. Penn stated that she was able to identify Moore because of his height and his eyes, which she described as being "evil." A voice identification line-up was also performed because Penn remembered Moore had told her to "lay it down." Although the microphone was not working well, Penn stated she could still identify Moore's voice and that it was not muffled. Penn also positively identified Moore in court.
 {¶ 55} Based on Penn's identification of Moore, and the fact that other witnesses, who did not know Penn, identified Moore as being involved in the crime, there was sufficient evidence presented that Moore was one of the participants.
 {¶ 56} Moore's fifth assignment of error is overruled.
 Repeat Violent Offender Specification {¶ 57} In his sixth and eighth assignments of error, Moore claims that the trial court failed to make findings that Moore's prior convictions resulted in physical harm to the victims, and he contends that his indictments failed to set forth sufficient evidence in support of the repeat violent offender specifications.
 {¶ 58} Pursuant to R.C. 2929.01(DD), a "repeat violent offender" is a person to whom both of the following apply:
 {¶ 59} "(1) The person has been convicted of or has pleaded guilty to, and is being sentenced for committing, for complicity in committing, or for an attempt to commit, aggravated murder, murder, involuntary manslaughter, a felony of the first degree other than one set forth in Chapter 2925. of the Revised Code, a felony of the first degree set forth in Chapter 2925. of the Revised Code that involved an attempt to cause serious physical harm to a person or that resulted in serious physical harm to a person, or a felony of the second degree that involved an attempt to cause serious physical harm to a person or that resulted in serious physical harm to a person.
 {¶ 60} "(2) Either of the following applies:
 {¶ 61} "(a) The person previously was convicted of or pleaded guilty to, and served a prison term for, any of the following:
 {¶ 62} "(i) * * * a felony of the first or second degree that resulted in the death of a person or in physical harm to a person, or complicity in or an attempt to commit any of those offenses."
 {¶ 63} Although Moore contends that the trial court erred by failing to make a finding that the victims suffered physical harm in his prior convictions, he stipulated prior to trial that physical harm was caused to the victims in those prior convictions. (TR. at 18). Therefore, the trial court did not have to make any findings regarding his prior convictions.
 {¶ 64} Furthermore, Moore failed to object to the indictment, and thus he waived any defect therein. Crim. R. 12(C)(2).
 {¶ 65} Accordingly, Moore's sixth and eighth assignments of error are overruled.
 {¶ 66} In his ninth and tenth assignments of error, Moore argues that because he did not physically harm Penn and because the jury found him not guilty of felonious assault, he could not be found guilty of the repeat violent offender specification.
 {¶ 67} As we state below in our discussion of the seventh assignment of error, "actual" physical harm is not required to be classified a repeat violent offender; "attempted" physical harm is sufficient. The facts in the instant case indicate that Barrow duct-taped a woman who was nine months pregnant and past her due date. This could have resulted in death or injury to the victim or her unborn child.
 {¶ 68} Furthermore, the fact that Moore was found not guilty of the felonious assault count did not exonerate him for aggravated robbery or aggravated burglary. The felonious assault count required the use of a gun. The aggravated burglary and aggravated robbery counts did not require use of a firearm, but only required that Moore physically harm or attempt to physically harm the victim.
 {¶ 69} Moore's ninth and tenth assignments of error are overruled.
 Sentencing Issues {¶ 70} In his seventh assignment of error, Moore contends that the trial court failed to make the requisite findings pursuant to R.C. 2929.14(D)(2)(a)(b)(i)(ii) in sentencing Moore to an additional ten years for the repeat violent offender specification.
 {¶ 71} Although Moore contends that R.C. 2929.14(D)(2)(a) requires a finding that actual harm was inflicted on the victim, we disagree. It merely states that the court may impose the maximum sentence if the violent offender causes harm to the victim. In the instant case, the trial court had already imposed the maximum sentence after finding Moore had a high risk of recidivism and committed the worst form of the offense. Furthermore, as we stated above, R.C. 2929.01(DD), in pertinent part, defines a repeat violent offender as convicted of either harming or attempting to physically harm a person.
 {¶ 72} R.C. 2929.14(D)(2)(b), however, states that after imposing the maximum term for the underlying offense, the trial court may impose additional time on the repeat violent offender if both of the following apply:
 {¶ 73} "(i) The terms so imposed are inadequate to punish the offender and protect the public from future crime, because the applicable factors under Section 2929.12 of the Revised Code indicate a greater likelihood of recidivism outweigh the applicable factors under that section indicating a lesser likelihood of recidivism.
 {¶ 74} "(ii) The terms so imposed are demeaning to the seriousness of the offense, because one or more of the factors under section 2929.12
of the Revised Code indicating that the offender's conduct is more serious than conduct normally constituting the offense are present, and they outweigh the applicable factors under that section indicating that the offender's conduct is less serious than conduct normally constituting the offense."
 {¶ 75} In the instant case, the trial court noted Moore's lengthy violent criminal record and concluded, "You are indeed a repeat violent offender. You are indeed a major drug offender. You are exactly the kind of person that the community needs to be protected from." The court also found that restraining a person in her own home during the daylight hours constituted the worst form of the offense, that Moore was lucky the baby did not die, and that he posed the greatest likelihood of committing future offenses.
 {¶ 76} These findings by the trial court fall short of what is required pursuant to R.C. 2929.14(D)(2)(b) because the trial court failed to find that the sentence for the underlying offenses did not adequately punish him for the offenses or that the sentence was demeaning to the seriousness of the offense. Accordingly, Moore's seventh assignment of error is sustained and his sentence vacated and the matter remanded for a new sentencing hearing.
 {¶ 77} In his fifteenth and sixteenth assignments of error, Moore argues the trial court erred by sentencing him to the maximum sentence. He argues the evidence did not support the maximum sentence and that he was sentenced to the maximum as punishment for not pleading guilty.
 {¶ 78} In imposing the maximum sentence, the trial court was required to make a finding that Moore fit within one of the categories set forth in R.C. 2929.14(C) and to give its reasons for its finding.State v. Edmonson (1999), 86 Ohio St.3d 324.
 {¶ 79} On the record, the trial court stated that the case constituted the worst form of the offense and that Moore posed the greatest risk of recidivism, both of which are categories set forth under R.C. 2929.14(C). In support of the recidivism finding, the trial court noted his extensive previous criminal history of felonious assaults with firearms, numerous drug trafficking charges, and the fact that his criminal record was "continuous and extensive since your juvenile days in 1991 * * *." (TR. 1469).
 {¶ 80} Therefore, the fact that Moore had an extensive history of prior violent offenses supported the trial court's imposing the maximum sentence.
 {¶ 81} In imposing this sentence, there is no indication that the trial court did so as punishment for Moore's refusal to agree to a plea.
 {¶ 82} Moore's fifteenth and sixteenth assignments of error are overruled.
 Constitutionality of Repeat Violent Offender Statute {¶ 83} In his eleventh and twelfth assignments of error, Moore argues that the repeat violent offender statute is unconstitutional because it constitutes a bill of attainder and that it also violates the prohibition against ex post facto laws. However, Moore failed to present these constitutional arguments in the court below and, therefore, they are waived for purposes of appeal. State v. Awan (1986), 22 Ohio St.3d 120,122; State v. Holly (July 8, 1999), Cuyahoga App. No. 74452.
 Double Jeopardy {¶ 84} In his fourteenth assignment of error, Moore contends his rights against double jeopardy were violated by the jury's finding no serious physical harm to the victim and acquitting him of felonious assault, yet finding him guilty of aggravated robbery, aggravated burglary, and kidnapping.
 {¶ 85} As discussed above, Moore's indictment for felonious assault was for threatening Penn with a deadly weapon. The jury found him not guilty of that charge along with the firearm specification. Moore's indictments for aggravated robbery and aggravated burglary did not require that a firearm be used but allowed for a conviction based on attempted or actual harm to the victim.
 {¶ 86} Accordingly, the jury's finding Moore not guilty of felonious assault but guilty of aggravated robbery and aggravated burglary did not result in inconsistent verdicts and did not violate Moore's rights against double jeopardy.
 {¶ 87} Moore's fourteenth assignment of error is overruled.
 {¶ 88} The conviction is affirmed; the sentence is vacated and the case remanded for a new sentencing hearing.
JOSEPH J. NAHRA, J.* concurs; PATRICIA ANN BLACKMON, P.J. concursin judgment only.
[1] This case was consolidated with Case No. 81298; however, because each appeal involves a different defendant and assigned errors, for ease of discussion, we will address each in a separate opinion.
* Sitting by assignment, Judge Joseph J. Nahra, Retired, of the Eighth District Court of Appeals.