JOURNAL ENTRY AND OPINION
{¶ 1} Defendant Khalid Arafat appeals from his convictions for felonious assault and destruction of evidence. For the reasons set forth below, we affirm the conviction but remand for resentencing.
 {¶ 2} On August 25, 2004, defendant and three co-defendants were indicted in connection with the August 14, 2004 beating of Mario Russo. With regard to this defendant, the indictment set forth charges of attempted murder, felonious assault, and rape, all with repeat violent offender specifications and notices of prior conviction. Defendant was also charged with tampering with evidence.
 {¶ 3} Defendant pled not guilty and the matter proceeded to a jury trial on December 8, 2004.
 {¶ 4} Candace Zidlicky testified that she resides in the Bunker Ridge Apartments, in North Royalton, a complex with two 12-suite buildings. According to Zidlicky, on the night of August 14, 2004, she heard female voices outside her apartment laughing and saying, "Stick it up his ass." She looked out and observed Russo near the parking lot in the fetal position. Zidlicky heard Russo moaning so she called the police. She looked out again and saw a man in a baseball cap nudging Russo.
 {¶ 5} On cross-examination, Zidlicky testified that the state's tape of the incident depicts the man kicking Russo.
 {¶ 6} Keven Daley, boyfriend of Candace Zidlicky, testified that he was awakened by a female voice saying, "stick it in his ass. He wants it in his ass. It's in his ass."
 {¶ 7} Daley looked out a window and observed Russo laying on his stomach.
 {¶ 8} On cross-examination, Daley stated that he looked out later and saw a man nudging Russo with his foot.
 {¶ 9} Jeffrey Phillips testified that he resides at the Bunker Hill Apartments. At approximately 4:30 a.m., he heard noises and saw a man on the ground with his pants around his legs and two males and two females standing over him. According to Phillips, the group was kicking the man on the ground and telling him to go home. Phillips recognized one of the females as a resident of apartment 102. One of the men had a blue bandanna on his head.
 {¶ 10} Phillips next heard one of the females tell the man that if he didn't get up and leave she was going to shove something up his ass. Later, after the police arrived, Phillips told them that the man with the blue bandanna was involved in the incident.
 {¶ 11} Sgt. David Centner of the North Royalton Police Department testified that he supervises the communications center for the department. Calls for emergency assistance are recorded, backed up on tape, dispatched to the proper responder and logged.
 {¶ 12} North Royalton Police Officer Mark Fyock testified that at approximately 5:30 a.m., he, Sgt. Elek and Officer Imars responded to a call of a man down at the Bunker Ridge Apartments. The officers spotted Russo badly beaten with a tree branch in his rectum. A broken denture plate was nearby.
 {¶ 13} Officer Fyock spoke to Keven Daley and Candace Zidlicky. Later, Jennifer Lewis gave Fyock a picture of Russo, her boyfriend.
 {¶ 14} On cross-examination, Officer Fyock testified that he spoke to Daniel Curtis, but on redirect examination, he stated that at this time, Curtis was just returning to the apartment complex.
 {¶ 15} Paramedic Richard Urich of the North Royalton Fire Department testified that he, Ken Valvoda and Michael Kupeck responded to a call for an ambulance from the Bunker Ridge Apartments. Urich observed that Russo's face was badly swollen and a tree branch was protruding from his rectum. Urich also detected the odor of alcohol.
 {¶ 16} On cross-examination, Urich acknowledged that his notes do not indicate that Russo had sustained an injury to his throat.
 {¶ 17} Lt. Kenneth Toth of the North Royalton Fire Department testified that Russo was semi-conscious and the paramedics suctioned Russo's airway to assist his breathing. Based upon the extent of Russo's injuries and history of seizures, Toth requested that Life Flight transport the victim to Metro Hospital.
 {¶ 18} Flight nurse specialist Andrea Adams testified that she attended to Russo and observed respirations indicative of neurological impairment. Neither Adams nor the accompanying physician could insert a breathing tube, however, due to Russo's injuries. Adams assessed Russo's neurological status using the Glasgow Scale and determined that he received 8 out of a possible score of 15. She administered Lidocaine to decrease cranial pressure.
 {¶ 19} Officer James Imars testified that he went to the apartment of Stacy Umstott but no one answered the door. Later, defendant exited the building and identified himself as "Mike Armand." According to Imars, defendant indicated that he did not have any information about the attack. Jeffrey Phillips then waved Imars over and said that he observed a man in a blue bandana attack Russo. A short time later, defendant exited the building wearing a blue bandanna and the officers took him into custody.
 {¶ 20} Sgt. Elek testified that Russo could not speak due to injuries to his mouth. Elek summoned Det. Drake to the scene and Dets. Drake and Barsa then later arrested five people at Umstott's apartment.
 {¶ 21} Bureau of Criminal Investigation ("BCI") Agent John Saraya testified that he photographed the crime scene and processed it for evidence. He observed blood stains, a tree branch, and a broken dental appliance. He did not observe any semen stains in this area. Saraya collected evidence from Umstott's apartment pursuant to a search warrant, including shoes, socks, a bloody shirt and a surveillance camera.
 {¶ 22} On cross-examination, he stated that there was a sleeping child in one of the bedrooms. He also acknowledged that the images from the security camera were stored in a computer at a different location and the removal of the security camera did not destroy these images.
 {¶ 23} BCI forensic scientist Chad Britton testified that he analyzed the evidence recovered in this matter and prepared a report of his findings. Presumptive testing indicated that blood was present on the shoes, shirt, socks, tree branch, and various items belonging to two of the co-defendants. He acknowledged, however, that items belonging to defendant, including his jeans, belt and bandanna were presumptively negative. Further the presumptive tests for blood do not indicate whether the blood is from a human. A false positive result may also occur and no blood typing was done in this matter.
 {¶ 24} Det. John Barsa testified that he recovered a Cleveland Cavaliers cap during a search of Umstott's apartment. He also authenticated numerous photographs. From the photographs, Barsa established that an Evergreen tree is in front of Umstott's building and the window to a back bedroom is partially blocked by bushes. Russo was found several feet from this area near a yard sign. A security camera was installed above the entrance. Finally, Barsa established that photographs taken from inside Umstott's apartment depict a tee shirt, white socks, vegetable matter resembling marijuana, and a device for smoking marijuana.
 {¶ 25} With regard to the images taken by the security camera, Barsa testified that the digital images were not saved in chronological order but display the time at which the image was taken.
 {¶ 26} Norbert Friedrich, a part-owner of the apartments, testified that he is licensed in security installations and that he installed the security cameras at the buildings. The system is a video recorder system which has a central recorder with an 80 gigabyte hard drive.
 {¶ 27} Friedrich also testified that Russo resided in one of the apartments and Stacy Umstott, a friend of defendant, resided in a basement level unit. With regard to the building occupied by Umstott, Friedrich testified that one security camera was installed on the adjacent building and is directed to the entranceway of Umstott's building. Another camera is above the doorway and directed at the inside security door, one is at the roof line, one is in the rear of the building, and one is in the laundry room. Images from each of the cameras were recorded on the hard drive of the computer and the time of day is imprinted on each image.
 {¶ 28} After North Royalton police notified him of the attack, he and Det. Stolarski then took the hard drive to Friedrich's home and made four CDs of the images.
 {¶ 29} According to Friedrich, the images were recorded in fifteen-minute intervals. For the first fifteen-minute interval, the images were recorded from camera 1, in a file designated volume 1. In the next interval, the images were recorded in a file designated volume 2. In the third interval, the images are obtained from camera 2. Because this camera has a motion sensor, the file length of its recordings varied, but were again recorded in two separate volumes, designated volume 1 and volume 2.
 {¶ 30} On cross-examination, Friedrich admitted that the saved images and computer had not been disturbed. On redirect, Friedrich testified that after camera 2 had been taken, it could no longer record.
 {¶ 31} Det. Mike Klein testified that he is a forensic video analyst for the City of Parma. Det. Klein testified regarding a process called padding, which slows down the fast motion effect generated where security camera images are taken every two seconds. By the padding process, duplicate images are displayed during the intervals between the saved images in order to make the saved images appear in normal time.
 {¶ 32} Det. Klein testified that Det. Drake of North Royalton asked him to view the video obtained in this instance because it was comprised of separate files from different CDs and was both difficult to view and very choppy. The North Royalton Police Department also asked Det. Klein to reproduce the video in a different format and string it all together so that the images could be viewed on a DVD player. Det. Klein strung the images together and made a VHS tape and a DVD.
 {¶ 33} With regard to the images, Det. Klein testified that the VHS and DVD display images of the primary view or overhead images with smaller images superimposed from the motion cameras when people enter or exit. He also took still photographs of the individuals from the video to help identify the persons depicted. On cross-examination, Det. Klein admitted that the disk which he originally received in this matter was padded, and he unpadded it in order to work on it, then re-padded it to create the final DVD.
 {¶ 34} Mario Russo testified that he receives Social Security Disability in connection with a head injury from a work-related accident that occurred several years before this incident. As a result of this injury, Russo suffers from seizures. Russo had no recollection of the incident at issue, but remembered having a seizure earlier that week and going to the hospital. He next recalls waking up at Metro and seeing detectives. Russo had stitches on his eye and lip and injuries to his head, face and back. He receives occupational therapy, speech therapy, and physical therapy as a result of his injuries.
 {¶ 35} Russo acknowledged that he has felony convictions from 1998, 1986, 1985 and 1983 and that he previously had a chemical dependency problem.
 {¶ 36} On cross-examination, Russo could not recall telling one of the doctors that he did not believe that he was having a seizure at the time he was assaulted. He had no recollection as to why he was outside near Umstott's apartment. Finally, he acknowledged that he indicated that he had no criminal record on a 2001 job application.
 {¶ 37} North Royalton Det. Jay Drake testified that he collected evidence, called Friedrich and spoke to Keven Daley and Jeffrey Phillips. Det. Drake also testified that the tape prepared by Det. Klein were true and accurate copies of the security camera images.
 {¶ 38} The tape was played for the jury and Det. Drake also testified to its contents. The tape depicts defendant entering the apartment at 4:07 a.m., Mario Russo coming from the adjacent building and walking in front of Umstott's living room picture window at 4:18 a.m. Three minutes later, Nick Phipps comes out of the foyer, looks to his left and the bushes, and goes toward the parking lot. Phipps then turned abruptly and walked back to Umstott's building. Next, defendant pulls Russo from the bushes. Two females are seen in the foyer at 4:23 a.m. At 4:25 a.m. the tape depicts Russo on the ground with his pants down and at 4:29 it depicts Phipps in a white shirt and defendant shirtless with a blue bandanna.
 {¶ 39} At 4:44 a.m., Solomon Curtis appears, and at 4:52 a.m., defendant and Phipps again approach Russo. Curtis then approached Russo and pulled at him then left. A few minutes later, Russo attempts to sit up and Umstott breaks a branch off of a tree, then she and Athena Lemieux kick Russo.
 {¶ 40} At 5:15, defendant takes security camera 2 and brings it to Umstott's apartment. Thirteen minutes later, an unknown man in a black shirt kicks Russo then enters the vestibule. Finally, police arrive at 5:34 a.m. They eventually spoke to defendant and he gave a false name and a false Social Security number.
 {¶ 41} Det. Drake read defendant his rights and defendant made a statement. According to this statement, Phipps exclaimed to the group that a man might be trying to peek into the window. They all "went outside and this guy was laying in between the bushes with his pants down and was snoring very loud" and defendant then poured water on him to wake him. Defendant claimed that he did not touch Russo.
 {¶ 42} On cross-examination, Det. Drake stated that neither shoes that defendant stated that he wore nor his bandanna had blood on them. He also acknowledged that he did not examine Russo's clothing or check the area for semen and that there is a broken slat on one of the blinds at Umstott's apartment. As to the events depicted on the tape, Drake admitted that, prior to the time he went to the bushes, Russo walked to the area, looked around, went back to his apartment, then returned to the bushes.
 {¶ 43} On redirect, Det. Drake testified that defendant changed his clothing throughout the course of the night and a Cleveland Cavaliers shirt he was seen in was never recovered. Shoes recovered from the apartment tested positive for blood.
 {¶ 44} Dr. John Como, a trauma surgeon with Metro, testified that Russo had facial swelling and lacerations, a closed fracture of the skull base with cerebral laceration and contusion, a laceration in his anus, a broken nose and a fractured maxillary sinus. He spent four days in intensive care and was later transferred to the rehabilitative unit.
 {¶ 45} On cross-examination, Dr. Como testified that Russo's medical record contains Russo's statement that he did not believe that he was having a seizure at the time of the attack.
 {¶ 46} Samantha Muscatello testified that her boyfriend is Umstott's cousin, Brandon Breeden, and Umstott's daughter is defendant's niece. According to Muscatello, she and Breeden had gotten into an argument earlier in the evening. She and Athena later met up with Breeden at Umstott's apartment and watched a movie. The group noticed lights from a car which shone into the apartment. A few minutes later, Phipps left the apartment to get a CD. When he returned, he said that there was a pervert outside. The group then ran outside and the group began to attack him. They returned to the apartment and, after the incident, defendant wondered why Russo had been at the window with his pants down and was concerned about whether Russo was still alive. Defendant said that he knocked the guy out then left the apartment to check on him. She then observed defendant and Phipps pull Russo's pants down.
 {¶ 47} On cross-examination, Muscatello testified that defendant and Umstott became hysterical when they heard about the man outside. When they confronted Russo, his pants were down. Russo's underwear was also pulled down. Russo tried to pull his pants up as the group approached but they fell back down. Russo then swung at the group, and everyone began yelling and fighting. Later, defendant pulled Russo's pants down lower. Finally, Muscatello admitted that she was later charged with possession of drugs but she stated that no deals were made with her in exchange for her testimony.
 {¶ 48} The matter was submitted to the jury at the close of the state's case and defendant was subsequently convicted of felonious assault and tampering with evidence. The trial court imposed consecutive sentences totaling thirteen years, plus post-release control. The trial court found the repeat violent offender specifications unconstitutional. Defendant now appeals and assigns four errors for our review.
 {¶ 49} In his first assignment of error, defendant complains that the convictions are not supported by the weight or sufficiency of the evidence.
 1. Manifest Weight {¶ 50} In State v. Thompkins, 78 Ohio St.3d 380, 386, 1997-Ohio-52, 678 N.E.2d 541, the court illuminated its test for manifest weight of the evidence as follows:
 {¶ 51} "Weight of the evidence concerns `the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other.' It indicates clearly to the jury that the party having the burden of proof will be entitled to their verdict, if, on weighing the evidence in their minds, they shall find the greater amount of credible evidence sustains the issue which is to be established before them. Weight is not a question of mathematics, but depends on its effect in inducing belief." Black's [Law Dictionary (6 Ed. 1990)], at 1594.
 {¶ 52} When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a "`thirteenth juror'" and disagrees with the factfinder's resolution of the conflicting testimony. Id., citing Tibbs v. Florida (1982), 457 U.S. 31,45, 102 S.Ct. 2211, 2220, 72 L.Ed.2d 652, 663. The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. See State v. Martin (1983), 20 Ohio App.3d 172, 175,485 N.E.2d 717, 720-721.
 {¶ 53} The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction. Id.
 {¶ 54} In this matter, we cannot conclude that the jury lost its way in convicting defendant of the instant offenses. As an initial matter, we note that tapes of the evening were recorded from the security cameras. In Midland Steel Prods. Co. v. UAWLocal 486 (1991), 61 Ohio St.3d 121, 573 N.E.2d 98, the Supreme Court set forth the acceptable methods for authenticating photographic evidence such as videotapes. One such method is the silent witness theory. Id. Under that theory, the photographic evidence is a `silent witness' which speaks for itself, and is substantive evidence of what it portrays independent of a sponsoring witness. The Court explained:
 {¶ 55} "Under the silent witness theory, photographic evidence may be admitted upon a sufficient showing of the reliability of the process or system that produced the evidence. McCormick, Evidence (3 Ed. Cleary Ed. 1984) 672, Section 214. * * * In support of this theory of admissibility, Midland Steel was not required to produce expert testimony regarding the reliability of its video surveillance system. United States v.Hobbs (C.A.6, 1968), 403 F.2d 977, 978. Rather, Midland Steel could show by lay testimony that the system was reliable. See, also, Evid.R. 201."
 {¶ 56} In this instance, the video played for the jury was altered to put the events recorded in the various volumes in chronological order and was also modified through a process called padding, wherein duplicate images are inserted between the photos taken by the security cameras at set intervals, in order to create a final product that approximates real time viewing. Det. Drake also testified that the tape prepared by Det. Klein were true and accurate copies of the security camera images. Moreover, we find nothing about either of these processes which renders the video unreliable, and we therefore conclude that the trial court did not err in admitting it into evidence.
 {¶ 57} We further note that the video depicts defendant and the others pulled Russo from the bushes and accosted him. Although others also beat and kicked Russo, defendant said that he had knocked him unconscious, repeatedly approached him as if to check on him, inquired of the others as to whether Russo may have died, and then removed a security camera, thereby rendering it inoperable. Paramedics arriving on the scene a short time later determined that Russo's injuries were severe and they contacted Life Flight. Russo's injuries included a closed skull fracture, broken nose, fractured maxillary sinus, and lacerations to his face and anus.
 {¶ 58} From the evidence of record, we cannot disagree with the jury's determination and we cannot conclude that the jury clearly lost its way and created such a manifest miscarriage of justice in convicting defendant of felonious assault and tampering with evidence.
 2. Sufficiency of the Evidence {¶ 59} "`Sufficiency' is a term of art meaning that legal standard which is applied to determine whether the case may go to the jury or whether the evidence is legally sufficient to support the jury verdict as a matter of law." State v. Thompkins,78 Ohio St.3d 380, 1997-Ohio-52, 678 N.E.2d 541. An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. Id.
 {¶ 60} The elements of felonious assault are set forth in R.C. 2903.11(A)(1) which provides:
 {¶ 61} "No person shall knowingly * * * cause serious physical harm to another."
 {¶ 62} Within this portion of the assigned error, defendant insists that there is insufficient evidence of serious physical harm. This contention is without merit.
 {¶ 63} As we noted previously, Russo sustained closed skull fracture, broken nose, fractured maxillary sinus, and lacerations to his face and anus. He spent four days in intensive care and was later transferred to the hospital's rehabilitative unit. This is sufficient to establish serious physical harm. Cf. State v.DeRose, Lake App. No. 2000-L-076, 2002-Ohio-4357. No rational trier of fact could have failed to find serious physical harm in this instance.
 {¶ 64} Defendant also insists that there is insufficient evidence to support the conviction for tampering with evidence since the images stored on the hard drive of the computer were not disturbed by the removal of the security camera, and the police subsequently identified all of the assailants in the course of their investigation.
 {¶ 65} The elements of tampering with evidence are set forth in R.C. 2921.12 which provides:
 {¶ 66} "(A) No person knowing that an official proceeding or investigation is in progress, or is about to be or likely to be instituted, shall do any of the following:
 {¶ 67} "(1) Alter, destroy, conceal, or remove any record, document, or thing, with purpose to impair its value or availability as evidence in such proceeding or investigation[.]"
 {¶ 68} The statute does not require destruction of stored images; it pertains to any record, document or thing. Clearly, a surveillance camera creates a record of value to an investigation and the destruction of a camera during the commission of an offense stops the creation of such record and renders that aspect of the surveillance system useless for obtaining additional evidence in the investigation of such incident. The fact that the investigation proceeds through different means or utilizes images captured prior to the destruction of the camera does not negate the offense.
 {¶ 69} The first assignment of error is without merit.
 {¶ 70} In his second assignment of error, defendant complains that he was denied effective assistance of trial counsel. Defendant complains that his counsel did not request a cautionary instruction concerning Muscatello's testimony, withdrew a motion to suppress the audio recording of defendant's statement which, defendant asserts, does not clearly indicate that defendant was read his constitutional rights, and did not compel the state to use only the original recordings obtained by the security cameras.
 {¶ 71} In a claim of ineffective assistance of counsel, the burden is on the defendant to establish that counsel's performance fell below an objective standard of reasonable representation and prejudiced the defense. Strickland v.Washington (1984), 466 U.S. 668, 80 L.Ed.2d 674, 104 S.Ct. 2052. To reverse a conviction for ineffective assistance of counsel, the defendant must prove "(1) that counsel's performance fell below an objective standard of reasonableness, and (2) that counsel's deficient performance prejudiced the defendant resulting in an unreliable or fundamentally unfair outcome of the proceeding." State v. Madrigal, 87 Ohio St.3d 378, 388-389, 2000-Ohio-448, 721 N.E.2d 52, citing Strickland v. Washington,
supra at 687-688.
 {¶ 72} As to the second element of the test, the defendant must establish "that there exists a reasonable probability that, were it not for counsel's errors, the result of the trial would have been different." State v. Bradley (1989),42 Ohio St.3d 136, 538 N.E.2d 373, paragraph three of the syllabus; Stricklandv. Washington, supra, at 686. The failure to prove any one prong of the Strickland two-part test makes it unnecessary for a court to consider the other prong. State v. Madrigal, supra, at 389, citing Strickland v. Washington, supra, at 697.
 {¶ 73} A debatable decision involving trial tactics generally does not constitute a deprivation of effective counsel. State v.Phillips, 74 Ohio St.3d 72, 1995 Ohio 171, 656 N.E.2d 643. InState v. Clayton (1980), 62 Ohio St.2d 45, 402 N.E.2d 1189, the Ohio Supreme Court discussed an attorney's choice of trial strategy and stated the following:
 {¶ 74} "* * * the fact that there was another and better strategy available does not amount to a breach of an essential duty to his client."
 {¶ 75} Applying the foregoing with regard to defendant's claim that a cautionary instruction should have been given, we note that the complicity statute, R.C. 2923.03, provides in pertinent part as follows:
 {¶ 76} "(A) No person, acting with the kind of culpability required for the commission of an offense, shall do any of the following:
 {¶ 77} "(1) Solicit or procure another to commit the offense;
 {¶ 78} "(2) Aid or abet another in committing the offense;
 {¶ 79} "(3) Conspire with another to commit the offense in violation of section 2923.01 of the Revised Code;
 {¶ 80} "(4) Cause an innocent or irresponsible person to commit the offense.
 {¶ 81} "* * *
 {¶ 82} "(D) If an alleged accomplice of the defendant testifies against the defendant * * * the court, when it charges the jury, shall state substantially the following:
 {¶ 83} "`The testimony of an accomplice does not become inadmissible because of his complicity, moral turpitude, or self-interest, but the admitted or claimed complicity of a witness may affect his credibility and make his testimony subject to grave suspicion, and require that it be weighed with great caution.'"
 {¶ 84} Here, however, the state did not pursue charges against Muscatello as an accomplice to defendant. She was not indicted in this matter and was never charged in connection with Russo's beating. Although she had drug charges pending in juvenile court as of the time of trial, the state asserted that the drug charges were completely unrelated to the instant matter, were filed two months prior to trial and that there was "no deal" in connection with this matter. (Tr. 752). Moreover, our review of the record does not establish that Muscatello's conduct meets the statutory definition of complicity. Under these circumstances, we can find no basis for a complicity instruction and defendant's trial counsel was not ineffective for failing to request a cautionary instruction.
 {¶ 85} Defendant next claims that his trial counsel withdrew a motion to suppress the audio recording of defendant's statement which, defendant asserts, does not clearly indicate that defendant was read his constitutional rights. We note, however, that the tape clearly indicates that Det. Drake read defendant his rights and had defendant read along on a preprinted form which defendant also signed. Because this contention lacks support in the record, it is without merit and is overruled.State v. Nickleberry (Nov. 22, 2000), Cuyahoga App. No. 77516, citing L.A.D. v. Bd. Of Commrs. (1981), 67 Ohio St.2d 384, 388,423 N.E.2d 1109.
 {¶ 86} Defendant also complains that his trial counsel erred by failing to compel the state to use only the original recordings obtained by the security cameras. We acknowledge that the video played for the jury was altered in that Det. Klein took the images from the various volumes and put them in chronological order. The video was also modified through a process called padding, wherein duplicate images are inserted between the photos taken by the security cameras at set intervals, in order to create a final product that approximates real time viewing. As we stated in our discussion of the previous assignment of error, however, we find nothing about either of these processes which renders the video unreliable, and we also note that Det. Drake testified that the tapes prepared by Det. Klein were true and accurate copies of the security camera images. As we have concluded that the trial court did not err in admitting it into evidence, we further conclude that counsel was not ineffective for failing to compel the state to use only the original images. Cf. State v. Henderson (1988), 39 Ohio St.3d 24, 33,528 N.E.2d 1237.
 {¶ 87} In accordance with all of the foregoing, the second assignment of error is without merit.
 {¶ 88} For his third assignment of error, defendant asserts that the trial court committed "cumulative and plain errors" which denied him a fair trial. We consider each contention in turn.
 1. Instruction on Aggravated Assault {¶ 89} The first claimed error cited by defendant is that the trial court refused to instruct the jury on aggravated assault as a lesser included offense of felonious assault because, defendant maintains, Russo's actions provoked the attack.
 {¶ 90} The Ohio State Supreme Court has held that aggravated assault, on which a jury charge was requested, is not a lesser included offense of felonious assault. State v. Deem (1988),40 Ohio St.3d 205, 210, 533 N.E.2d 294. However, the Deem court held that in a trial for felonious assault, where the defendant presents sufficient evidence of serious provocation such that a jury could both reasonably acquit defendant of felonious assault and convict defendant of aggravated assault, an instruction on aggravated assault as a different degree of felonious assault must be given. Id. at 211.
 {¶ 91} The court then defined "serious provocation" as provocation that is "reasonably sufficient to bring on extreme stress and the provocation must be reasonably sufficient to incite or to arouse the defendant into using deadly force." Id. at paragraph five of the syllabus.
 {¶ 92} Thus, a defendant charged with felonious assault is not automatically entitled to an instruction on aggravated assault. State v. Davis (Oct. 30, 1996), Summit App. No. 17585, unreported. If the defendant does not produce sufficient evidence of serious provocation, the trial court does not err by refusing to instruct the jury on aggravated assault. Id.
 {¶ 93} In determining whether provocation is sufficient to bring on sudden passion or a sudden fit of rage, an objective standard must first be applied. State v. Shane (1992),63 Ohio St.3d 630, 634, 590 N.E.2d 272. Once the objective standard is met, then the inquiry shifts to the subjective state of mind of the defendant. Id. The court in Shane further noted that if insufficient evidence of provocation is presented, so that no reasonable jury would decide that an actor was reasonably provoked by the victim, the trial judge must, as a matter of law, refuse to give an aggravated assault instruction. In that event, the objective portion of the consideration is not met, and no subsequent inquiry into the subjective portion, when the defendant's own situation would be at issue, should be conducted.
 {¶ 94} In State v. Koballa, Cuyahoga App. No. 82013, 2003-Ohio-3535, the appellant's factual basis for requesting an aggravated assault instruction was that the victim grabbed him by the testicles and the arm, and this brought about a sudden passion or fit of rage. In determining that the court did not err by failing to instruct the jury as to aggravated assault this court stated:
 {¶ 95} "First, appellant failed, even assuming the jury believed his version of the facts, to establish that Zinicola's actions constituted a serious provocation. Considering the circumstances, we do not find that appellant was seriously provoked to justify slashing Zinicola's neck. In particular, Zinicola was in the compromising position of being on his knees; appellant was not alone but in the same room and company of his friend; there was no evidence to suggest Zinicola had a weapon on or about his person; and no evidence suggested appellant could not have exited the condominium without force.
 {¶ 96} "Although appellant testified that his testicles and arm were grabbed, these two facts alone do not justify the use of such force. We are also not persuaded by appellant's argument that Zinicola's apparently larger stature justified his actions."
 {¶ 97} Further in State v. Bryan, Galia App. No. 03CA3,2004-Ohio-2066, the court noted that a victim's simple pushing or punching does not constitute sufficient provocation to warrant an aggravated assault instruction. Id., citing State v. Koballa,
supra; State v. Poe, Pike App. No. 00CA9, 2000-Ohio-1966 (concluding that the victim's conduct in approaching the defendant with a hammer and stating "come on" did not constitute sufficient provocation); State v. Pack (June 20, 1994), Pike App. No. 93CA525 ("We find that a mere shove and a swing (which appellant by his own testimony ducked) are insufficient as a matter of law to constitute serious provocation reasonably sufficient to incite or arouse appellant into using deadly force.")
 {¶ 98} Applying the foregoing, we are unable to conclude that the trial court erred in this matter. Applying the precedent ofKoballa and Bryan, the alleged actions of Russo must likewise be deemed insufficient to warrant the instruction.
 {¶ 99} In any event, defendant's own statement indicates that Russo was in the bushes snoring and did not provoke the attack.
 2. Statements of Umstott and Muscatello as to Provocation {¶ 100} Defendant further complains that the trial court erred in refusing to admit Umstott's statement to Det. Drake that the group observed Russo masturbating in the bushes outside the window and that the rape shield law prohibited introduction of evidence concerning Russo's conduct. Defendant raises a similar challenge to the trial court's refusal to allow Muscatello to be cross-examined as to Phipps' statement that he observed Russo masturbating in the bushes outside Umstott's apartment.
 {¶ 101} Defendant maintains that the out-of-court statements of Umstott and Phipps should have been admitted because the statements were against their interests and both witnesses were unavailable to testify.
 {¶ 102} A decision whether to admit the hearsay statement of an unavailable declarant pursuant to Evid.R. 804(B)(3) is one within the discretion of the trial court. See State v. Landrum
(1990), 53 Ohio St.3d 107, 114, 559 N.E.2d 710, 720.
 {¶ 103} Evid.R. 804(B)(3) provides:
 {¶ 104} "Hearsay exceptions. The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:
 {¶ 105} "* * *
 {¶ 106} "(3) Statement against interest. A statement that * * * at the time of its making * * * so far tended to subject the declarant to civil or criminal liability * * * that a reasonable person in the declarant's position would not have made the statement unless the declarant believed it to be true. A statement tending to expose the declarant to criminal liability, whether offered to exculpate or inculpate the accused, is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement."
 {¶ 107} In this matter, Umstott invoked her right not to testify and was therefore unavailable. State v. Sumlin,69 Ohio St.3d 105, 1994-Ohio-508, 630 N.E.2d 681. However, we agree with the state's assessment that the Umstott statement was not against interest. The claim that Russo was in the bushes masturbating did not tend to subject Umstott to civil or criminal liability.
 {¶ 108} In any event, the court permitted Muscatello to testify that Phipps told the group that he saw a pervert outside (Tr. 725), that upon running outside for the first time, she observed Russo with his pants and underwear down (Tr. 742), and after the incident, defendant wondered why Russo had been at the window with his pants down. Muscatello stated that she saw the group on top of Russo but she did not state that she observed Russo masturbating, however.
 {¶ 109} In accordance with the foregoing, we find no abuse of discretion. This portion of the assignment of error is without merit.
 2. Evidence Proffered to Refute Tampering with Evidence {¶ 110} Defendant next complains, with regard to the offense of tampering with evidence, that the trial court erroneously refused to let him present evidence which would have established that the police did eventually find all of the suspects involved in this incident.
 {¶ 111} The decision to admit or exclude evidence lies in the sound discretion of the trial court. State v. Sage (1987),31 Ohio St.3d 173, 180, 510 N.E.2d 343.
 {¶ 112} As we noted previously, R.C. 2921.12 does not require destruction of stored images; it pertains to any record, document or thing. Destruction of a camera during the commission of an offense stops the creation of such record and renders that aspect of the surveillance system useless for obtaining additional evidence in the investigation of such incident. The fact that the investigation proceeds through different means or utilizes images captured prior to the destruction of the camera does not negate the offense. Accordingly, the trial court did not abuse its discretion in prohibiting the defense from presenting evidence that the investigation continued despite additional images from one of the surveillance cameras.
 {¶ 113} This aspect of the assignment of error is without merit.
 3. Cross-Examination of Russo {¶ 114} Defendant also complains that the trial court erred in prohibiting his trial counsel from cross-examining Russo with questions as to how he could afford cocaine, and questions to refute that Russo was having a seizure in the bushes.
 {¶ 115} We find no abuse of discretion as to the inquiry regarding cocaine as the evidence demonstrated that Russo had a 1998 drug conviction and this cross-examination lacked relevance. Evid.R. 404.
 {¶ 116} We also find no prejudicial error as to further cross-examination regarding a possible seizure, as Russo stated that he had no recollection of the events preceding the assault. Moreover, in his questioning of Dr. Como, defendant's trial counsel elicited evidence that the medical record contains Russo's statement that he did not believe that he was having a seizure at the time of the attack.
 {¶ 117} This aspect of the assignment of error is without merit.
 4. Witness's Comments as to Cost of DNA {¶ 118} Defendant next complains that the trial court erred in permitting Chad Britton to testify that DNA testing generally costs $1000 (Tr. 435), made in connection with the state's evidence concerning why DNA testing was not performed in this matter. The transcript reveals that Chad Britton testified on direct examination that the cost of one DNA analysis is approximately $1,000. (Tr. 417). He later reiterated that this was the "general figure" of analysis. We find nothing prejudicial about this comment.
 5. Court's Comments Regarding the Deliberations of Another Jury {¶ 119} Here defendant complains that the trial court's comment that "we forgot to give them an IQ test" (Tr. 110-111) made in connection with the length of time that a different jury was taking with its deliberations may have discouraged defendant's jury from asking questions or thoroughly deliberating.
 {¶ 120} A court should not make comments to a jury which interrupt the natural course of deliberations and deprive the litigants of a fair trial. Feller v. Alteums (March 27, 1980), Cuyahoga App. No. 40636. In this instance, however, there is no indication that the judge's comment had any effect on deliberations and in fact the record indicates that the jury acquitted defendant of attempted murder and rape.
 {¶ 121} This claim lacks merit.
 6. Det. Drake's Narration of Tape {¶ 122} Defendant also complains that the trial court committed prejudicial error by permitting Det. Drake to narrate the video with opinions concerning the identity of various persons, their actions, and the reasons for their conduct. After a review of the record, this court finds that there is no evidence that appellants were materially prejudiced. The trial court did not abuse its discretion. Accord Sullinger v. Moyer
(August 6, 1997), Mahoning App. No. 96 C.A. 152; State v.Blackmon (February 14, 1995), Franklin App. 94APA05-773.
 7. Photographs Displayed On Projector {¶ 123} Defendant also asserts that the trial court erred in permitting the state to display photographs on a projector board, and without displaying them to the defense before viewing by the jury.
 {¶ 124} The use of slides is not prejudicial per se. Statev. Joseph (1995), 73 Ohio St.3d 450, 653 N.E.2d 285. See also,State v. Biros (Dec. 29, 1995), Trumbull App. No. 91-T-4632.
 {¶ 125} Although the correct procedure is to show the photograph to the court and opposing counsel before publishing them to the jury, the failure to do so in this instance does not constitute prejudicial error. Cf. State v. Moss (April 12, 2001), Franklin App. No. 00AP-574.
 8. Punishing Defendant for Going to Trial {¶ 126} Defendant next asserts that the trial court implicitly threatened to treat him more severely for exercising his right to trial then carried out such threat when it imposed maximum and consecutive sentences.
 {¶ 127} With regard to the pretrial comment, we note that due to the judge's position in the criminal justice system such participation presents a great potential for coerced guilty pleas and can easily compromise the impartial position a trial judge should assume. State v. Byrd (1980), 63 Ohio St.2d 288,407 N.E.2d 1384, syllabus. Accordingly, such participation is closely scrutinized for coercion. Id.
 {¶ 128} In this matter, the court told defendant that the "sentence could be substantially more than the time that was offered to you." (Tr. 11) However, we cannot conclude that the trial court's remark was coercive or that it would reasonably cause defendant to conclude that he would be sentenced for his decision to go to trial, rather than for any subsequent conviction.
 {¶ 129} This aspect of the assignment of error is without merit.
 9. Sentencing Issues {¶ 130} Finally, defendant complains that the trial court erred in making findings at sentencing, imposing maximum and consecutive sentences in this matter, imposing a sentence which was dissimilar to the sentences received by similar offenders, failing to notify defendant of the consequences of violating post-release control, and in journalizing a sentencing order that contained the repeat violent offender designation.
 a. Findings b. Maximum Sentences c. Consecutive Sentences {¶ 131} R.C. 2929.14(C) sets forth findings which a trial court must make before imposing a maximum sentence. R.C.2929.19(B)(2)(d) further requires that the trial court state its reasons for imposing the maximum prison term. In State v.Edmonson, 86 Ohio St.3d 324, 328, 1999 Ohio 110, 715 N.E.2d 131, the Supreme Court held a trial court must "make a finding that gives its reasons for selecting the sentence imposed[.]" .
 {¶ 132} R.C. 2929.14(E)(4) sets forth the circumstances that must exist before consecutive sentences can be imposed. In Statev. Comer, 99 Ohio St.3d 463, 2003-Ohio-4165, 793 N.E.2d 473, the Supreme Court held that a trial court must articulate both "findings" for imposing consecutive sentences and "reasons" for those findings.
 {¶ 133} In State v. Foster, ___ Ohio St.3d ___,2006-Ohio-856, the Supreme Court held that R.C. 2929.14(B) and (C) and R.C. 2929.19(B)(2) were unconstitutional since they required judicial factfinding before imposition of a sentence greater than the maximum term authorized by a jury verdict or admission of a defendant. The Court then severed these provisions from the Ohio sentencing statutes. In State v. Mathis, ___ Ohio St.3d ___, 2006 Ohio 855, the Supreme Court held that postseverance, judicial factfinding is no longer required before the imposition of consecutive prison terms or maximum terms. Instead, the trial court is vested with discretion to impose such term. In this connection, the trial court must "carefully consider the statutes that apply to every felony case [including] R.C. 2929.11, which specifies the purposes of sentencing, and R.C. 2929.12, which provides guidance in considering factors relating to the seriousness of the offense and recidivism of the offender [and] statutes that are specific to the case itself."
 {¶ 134} The Foster Court noted, however, that the defendants' sentences were based upon unconstitutional statutes (i.e, including one defendant with maximum and consecutive sentences) and that their cases, along with the cases pending on direct review must be remanded for new sentencing hearings. Accordingly, this matter must be remanded for resentencing.
 d. Disproportional Sentence {¶ 135} Within this claim, defendant asserts that other offenders prosecuted in connection with the attack on Russo received less severe sentences and that the sentence is otherwise disproportionate. As we have remanded this matter for resentencing, this claim is moot. App.R. 12.
 e. Consequences of Violating a Term of Post-Release Control {¶ 136} Defendant next complains that the trial court failed to advise him of the consequences of violating a term of post-release control.
 {¶ 137} As we have remanded this matter for resentencing, this claim is moot. App.R. 12.
 f. RVO Designation on Journal Entries {¶ 138} Defendant also complains that the trial court's journal entries for the conviction and the sentence both indicate that defendant was convicted of the Repeat Violent Offender Specifications, despite the fact that the court stated on the record that they were unconstitutional. (Tr. 963). Cf. State v.Malcolm (Aug. 11, 2005), Cuyahoga App. No. 85351, 2005-Ohio-4133
(finding the specifications unconstitutional).
 {¶ 139} As we have remanded this matter for resentencing, this claim is moot. App.R. 12.
 {¶ 140} The third assignment of error is well-taken in part.
 {¶ 141} In his fourth assignment of error, defendant complains that the prosecuting attorney committed misconduct by presenting a video which was padded, edited and changed from its original form, misled the jury by claiming that removal of a camera prevented identification of one of the assailants, claimed matters not in evidence, including that defendant "pummeled Russo, tried to move Russo," and that some assailants spoke of disposing the body. Defendant also asserts that the state did not thoroughly or fairly investigate this matter and elicited testimony that DNA was not needed and that the jury was free to disbelieve a forensic expert if he were to claim that he did not find blood.
 {¶ 142} As an initial matter, we note that a prosecuting attorney's conduct during trial does not constitute grounds for error unless the conduct deprives the defendant of a fair trial.State v. Keenan (1993), 66 Ohio St.3d 402, 402-405,613 N.E.2d 203; State v. Gest (1995), 108 Ohio App.3d 248, 257,670 N.E.2d 536. The touchstone of a due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor. Smith v. Phillips (1982),455 U.S. 209, 71 L.Ed.2d 78, 102 S.Ct. 940. The effect of the prosecutor's misconduct must be considered in light of the whole trial. State v. Durr (1991), 58 Ohio St.3d 86, 94,568 N.E.2d 674.
 1. Facts Not in Evidence {¶ 143} Defendant asserts that the prosecuting attorney committed misconduct by arguing facts which were unsupported by the evidence. In particular, defendant objects to argument that defendant "pummeled" Russo, that he would have continued to assault Russo but for the actions of Phipps, that removal of the camera impeded the investigation as to someone in a black shirt and that DNA was too costly to perform in this matter. Defendant also claims that the most serious beating came from Solomon Curtis.
 {¶ 144} Generally, prosecutors are entitled to considerable latitude in opening and closing arguments. State v. Ballew
(1996), 76 Ohio St.3d 244, 255, 1996 Ohio 81, 667 N.E.2d 369. A prosecutor may freely comment on what the evidence has shown and what reasonable inferences the prosecutor believes may be drawn therefrom. State v. Lott (1990), 51 Ohio St.3d 160, 165,555 N.E.2d 293. A prosecutor may not argue facts not in evidence, however. State v. Liberatore (1982), 69 Ohio St.2d 583,433 N.E.2d 561; State v. Daugherty (1987), 41 Ohio App.3d 91,534 N.E.2d 888.
 {¶ 145} In this matter, we conclude, based upon a thorough review of the record, that the statement that defendant "pummeled" Russo, that the removal of the security camera impeded the investigation, and that DNA was too costly to perform in this matter were supported in the record. Similarly, the evidence establishes that Curtis assaulted Russo, but he was already incapacitated at this time. Accordingly, the prosecutor was not required to identify him as the primary assailant. In addition, the comment as to Phipps preventing a further attack was not prejudicial.
 2. Use of Videotape {¶ 146} Defendant also complains that the prosecutor committed misconduct in presenting hearsay from the videotape which was altered through the padding process.
 {¶ 147} As we have previously determined that no prejudicial error occurred in connection with the use of the videotape, we likewise reject this assignment of error.
 {¶ 148} The fourth assignment of error is without merit.
 {¶ 149} The convictions are affirmed, and the matter is remanded for re-sentencing.
It is ordered that appellee recover of appellant its costs herein taxed.
The Court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this Court directing the Common Pleas Court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
Gallagher, J., Concurs with Majority Opinion and Judge Rocco'sConcurring Opinion (See Attached Concurring Opinion)
 Rocco, J., Concurs with Majority Opinion and Judge Gallagher'sConcurring Opinion (See Attached Concurring Opinion)
 CONCURRING OPINION